509 So.2d 292 (1987)
In re ADVISORY OPINION TO THE GOVERNOR, Request of May 12, 1987.
No. 70533.
Supreme Court of Florida.
July 14, 1987.
*295 Charles R. Ranson of Ranson & Wiggins, Tallahassee, and Gregory L. Diskant of Patterson, Belknap, Webb & Tyler, New York City, for Association of Nat. Advertisers, Inc., American Ass'n of Advertising Agencies, Inc. and the American Advertising Federation.
Richard G. Garrett and Stuart H. Singer of Greenberg, Traurig, Askew, Hoffman, Lipoff, Rosen & Quentel, Miami, Paul Dodyk of Cravath, Swaine & Moore, New York City, Robert Saltzstein of Wyatt & Saltzstein, Washington, D.C., and Howell L. Ferguson, Tallahassee, for Magazine Publishers Ass'n and The Ass'n of Business Publishers.
Lloyd N. Cutler, Timothy B. Dyk and A. Douglas Melamed of Wilmer, Cutler & Pickering, Washington, D.C., and Donald M. Middlebrooks of Steel, Hector & Davis, *296 Miami, for Stephen A. Weiswasser, Sr. Vice President and General Counsel and Sam Antar, Capital Cities/ABC, Inc., New York City, George Vradenburg III, Vice President and General Counsel, CBS Inc., New York City, Corydon B. Dunham, Executive Vice President and General Counsel, Nat. Broadcasting Co., Inc., New York City, and Howard Monderer, Vice President, Law, Washington, Nat. Broadcasting Co., Inc., Washington, D.C.
Donald M. Middlebrooks, Thomas R. Julin, Samuel J. Dubbin, Norman Davis and Jason B. Meyer of Steel, Hector & Davis, Miami, for Florida Ass'n of Broadcasters, National Ass'n of Broadcasters, Post-Newsweek Stations, Florida, Inc., Scripps Howard Broadcasting Co., Susquehanna Radio Corp., WEAR-TV, Pensacola, Metropolitan Broadcasting Corp., Independent Florida Agrient and Fairbanks Communications, Inc.
Robert E. Meale of Baker & Hostetler, Orlando, for Baker & Hostetler.
Gerald B. Cope, Jr. and Laura Besvinick of Greer, Homer, Cope & Bonner, Miami, Richard J. Ovelmen, South Miami, and Dan Paul and Franklin G. Burt of Finley, Kumble, Wagner, Heine, Underberg, Manley, Meyerson & Casey, Miami, for Florida Press Association and Boca Raton News, Inc.
Dan Paul, Franklin G. Burt and John E. Kirkpatrick of Finley, Kumble, Wagner, Heine, Underberg, Manley, Meyerson & Casey, Miami, and George H. Freeman, New York City, for New York Times Co. Florida Newspapers.
Robert M. Ervin and Richard W. Ervin of Ervin, Varn, Jacobs, Odom & Kitchen, Tallahassee, for Interested Parties.
David W. Johnson of Johnson & Crane, Miami, for Florida Motion Picture and Television Ass'n, Inc.
Parker D. Thomson and Cloyce L. Mangas, Jr. of Thomson, Zeder, Bohrer, Werth & Razook, Miami, Gerald B. Cope, Jr. and Laura Besvinick of Greer, Homer, Cope & Bonner, and Richard J. Ovelmen and Samuel A. Terilli, Office of General Counsel, Miami, for Miami Herald Pub. Co.
Julian Clarkson, Gregg D. Thomas, Steven L. Brannock, Laurel Lenfestey Helmers and Carol Jean LoCicero of Holland & Knight, Tampa, for The Tribune Co., The Florida Press Ass'n, Gannett Co., Inc., The Media General Broadcast Group, and The Florida Retail Federation.
Barry Richard and Lorence Jon Bielby of Roberts, Baggett, LaFace & Richard, Tallahassee, for The Florida Bar, Joseph J. Reiter, Renee Higgins, Victor Wade Howell and Brenda L. Smith.
Robert P. Smith, Jr. and Elizabeth C. Bowman of Hopping, Boyd, Green & Sams, Tallahassee, for Frank J. Carver, Joseph B. Carr, Mahlon Hendley and others.
Bruce Rogow and Steven Friedland, Ft. Lauderdale, and Milton Hirsch, Miami, for James M. Russ, Edward R. Shohat and Theodore Klein for Florida Criminal Defense Lawyers.
John W. Caven, Jr., Allan P. Clark and Steven R. Browning of Caven, Clark & Ray, Jacksonville, for Florida Associated General Contractors Council, Inc.
Stephen J. Wein and Kelli Hanley Crabb of Battaglia, Ross, Hastings, Dicus & Andrews, St. Petersburg, for North American Financial Services, Ltd.
Chris W. Altenbernd and Charles A. Wachter of Fowler, White, Gillen, Boggs, Villareal & Banker, Tampa, for Fiserv of Tampa, Inc.
Edith Broida, Miami, for interested party.
Ray Ferrero, Jr. and Wilton L. Strickland of Ferrero, Middlebrooks, Strickland & Fischer, Fort Lauderdale, and William G. Mateer, Lawrence J. Phalin, David L. Evans and Clay H. Coward of Mateer, Harbert & Bates, Orlando, for News and Sun-Sentinel Co., and Sentinel Communications Co.
Douglas W. Abruzzo, Tallahassee, for interested party.
Robert A. Altman, J. Griffin Lesher and James C. Duff of Clifford & Warnke, Washington, D.C., for Daniel F. O'Keefe, Jr. and Eve E. Bachrach, The Proprietary Ass'n, Inc.
*297 Joseph C. Spicola, Jr., General Counsel to the Governor, and Alan C. Sundberg, Sylvia H. Walbot and Cynthia S. Tunnicliff of Carlton, Fields, Ward, Emmanuel, Smith, Cutler & Kent, Tallahassee, for the Governor.
Talbot D'Alemberte, Joseph W. Jacobs and Adam J. Hirsch, Tallahassee, for the Legislature.
William Townsend, General Counsel and Jeffrey Kielbasa, Deputy General Counsel, Tallahassee, and Steven S. Rosenthal and Walter Hellerstein of Morrison & Foerster, Washington, D.C., for the Florida Dept. of Revenue.
Robert A. Butterworth, Atty. Gen., and Joseph C. Mellichamp, III, Kevin J. Odonnell and Eric J. Taylor, Asst. Attys. Gen., Tallahassee, for the Atty. Gen.
Jack M. Skelding, Jr. and Julius F. Parker, Jr. of Parker, Skelding, McVoy & Labasky, Tallahassee, for Florida Informanagement Services, Inc.
The Honorable Bob Martinez
Governor of Florida
The Capitol
Tallahassee, Florida 32301
Dear Governor Martinez:
We have the honor of acknowledging your communication of May 12, 1987, requesting our advice, pursuant to article IV, section 1(c) of the Florida Constitution and rule 9.500 of the Florida Rules of Appellate Procedure, as to the interpretation of a portion of the Constitution affecting your fiscal duties as Governor.
Omitting the formal parts, your letter reads as follows:
"Pursuant to Article IV, Section 1(c) of the Constitution of the State of Florida, your opinion is requested as to the interpretation of my executive duties and responsibilities as chief executive under Article VII, Section 1(d) and Article IV, Section 1(a), of the Constitution of the State of Florida.
"Article VII, Section 1(d) requires that `provision shall be made by law for raising sufficient revenue to defray the expenses of the state for each fiscal period' and Article IV, Section 1(a) relates to my general obligations as chief executive, in particular, my duty to insure `that the laws be faithfully executed.' In furtherance of those constitutional mandates, I am required to submit to the Legislature a recommended budget which contains sufficient revenues to meet my recommended appropriations, Chapter 216, Florida Statutes, and to amend my recommendations if it comes to my attention that revenue sources are insufficient to fund the appropriations, Section 216.168, Florida Statutes.
"Upon my election to office, I became acutely aware that in order to meet the requirements of this fast growing State, a new revenue source must be found to address pressing and compelling correctional, educational, health and other infrastructure needs. Pursuant to my constitutional and statutory authority and responsibilities, I, therefore, recommended to the Legislature a budget which contained projected revenues from a tax to be imposed on the sale or use of services in this State and recommended that such tax be implemented by the enactment of appropriate legislation. The Legislature responded by enacting into law Chapter 87-6, Laws of Florida (1987).
"Chapter 87-6 imposes a general tax on the sale or use of services consumed or enjoyed in the state. Services that are sold in the state but are consumed or enjoyed outside the state generally are not taxed under Chapter 87-6. A sale of service is deemed to occur in the state when more than 50 percent of the service is performed within the state based on costs of performance. A use of a service is deemed to occur in the state when the sale of the service takes place outside the state and the service is consumed or enjoyed within the state. The structure of the tax on the sale or use of services imposed by Chapter 87-6 thus follows the traditional pattern of Florida's sales and use taxes on tangible personal property, which imposes a tax on the use of property that is purchased outside the *298 state but is subsequently used or consumed within the state.
"Moreover, the tax on the sale and use of services imposed by Chapter 87-6 in many cases is apportioned to the extent that the service is enjoyed (consumed) in the state. The preexisting provision of Chapter 212 [Florida Statute 212.06(7)] that effectively provides a credit for sales and use taxes paid to other states has been extended by Chapter 87-6 to taxes imposed on services by other states. Hence, Florida's use tax on services will not apply insofar as the sale or use of such services in other states has lawfully been taxed by such other state.
"At the time I recommended a tax on the sale or use of services, there was no doubt in my mind that the tax was appropriate and valid. Indeed, I continue in that belief today. Since the enactment of Chapter 87-6, Laws of Florida, however, debate has raged as to the constitutional validity of the new tax. Numerous lawsuits attacking the statute have been filed or threatened.
"The challenges to the validity of Chapter 87-6 which have already been asserted or suggested can be categorized as follows:
(1) Due process  Whether a general tax on the sale or use of services consumed or enjoyed in the state, including legal services, impermissibly burdens the right to legal counsel and access to the courts in violation of the due process clauses of Article 1, Section 9 of the Florida Constitution and the 14th Amendment to the U.S. Constitution.
(2) Equal protection  Whether a general tax on the sale or use of services consumed or enjoyed in the state, which exempts some users of a service, denies equal protection of the laws in violation of Article I, Sections 2 and 9 of the Florida Constitution and the 14th Amendment to the U.S. Constitution.
(3) Access to courts  Whether a general tax on the sale or use of services consumed or enjoyed in the state, including legal services, impermissibly restricts access to and use of the state or federal courts in violation of Article I, Section 21 of the Florida Constitution, Article III of the U.S. Constitution and the 5th, 6th and 14th Amendments to the U.S. Constitution.
(4) Free speech, press and association  Whether a general tax on the sale or use of services consumed or enjoyed in the state, including advertising services, violates the freedom of speech, press or association of advertisers or of media in which the advertising is carried in violation of Article I, Section 4 of the Florida Constitution and the 1st and 14th Amendments to the U.S. Constitution.
(5) Income tax  Whether a general tax on the sale or use of services consumed or enjoyed in the state is an income tax prohibited by Article VII, Section 5 of the Florida Constitution.
(6) Commerce clause  Whether a general tax on the sale or use of services consumed or enjoyed in the state, including advertising services, where the tax is apportioned and a credit is provided for a tax imposed by another state, violates the Commerce Clause of Article I of the U.S. Constitution.
(7) Miscellaneous constitutional challenges  These challenges do not neatly fit into the above categories and are listed below:
(a) Separation of powers  Whether a general tax on the sale or use of services consumed or enjoyed in the state, including legal services, violates the separation of powers requirement of Article II, Section 3 of the Florida Constitution.
(b) Supremacy clause  Whether a general tax on the sale or use of services consumed or enjoyed in the state, including legal services, in connection with litigation before the federal courts, violates the Supremacy Clause contained in Article VI of the U.S. Constitution.
(c) Single subject  Whether Chapter 87-6 violates the single subject requirement *299 of Article III, Section 6 of the Florida Constitution.
(d) Right to counsel  Whether a general tax on the sale or use of services consumed or enjoyed in the state, including legal services, breaches the attorney/client privilege and, thus, impermissibly burdens the right to counsel under both Article I, Section 16 of the Florida Constitution and the 6th and 14th Amendments of the U.S. Constitution.
(e) Exercise of rights  Whether a general tax on the sale or use of services consumed or enjoyed in the state, including legal services, impermissibly burdens the exercise of rights secured by the 5th, 6th, and 8th Amendments to the U.S. Constitution.
"The Justices of this Court have considered federal constitutional questions in past advisory opinions insofar as those issues have impacted upon a governor's duties. Advisory Opinion to the Governor, [157 Fla. 885], 27 So.2d 409 (1946); In re Advisory Opinion to the Governor, 150 So.2d 721 (1963).
"The uncertainty created by the pending and threatened litigation assailing the constitutionality of the statute has created doubt as to my constitutional duties and responsibilities. The Justices of this Court have determined that the Governor's duty to insure sufficient revenue sources to meet projected expenditures under Article VII, Section 1(d) and his duty to insure the laws are faithfully executed under Article IV, Section 1(a), are proper foundations upon which to base a request for an advisory opinion involving the validity of a new revenue source. See In re Advisory Opinion to the Governor, 243 So.2d 573 (1971), wherein this Court responded to the request of Governor Askew as to whether his corporate income tax proposal violated Article VII, Section 5 of the Constitution of the State of Florida.
"Specifically, I am in doubt as to whether under the fiscal responsibilities imposed on me by the Constitution and implementing legislation, it will be necessary for me to submit an amended budget to the Legislature for consideration which eliminates as a revenue source taxes collected on the sale or use of services under Chapter 87-6, Laws of Florida.
"It is recognized that in advising me as to my constitutional duties under Article VII, Section 1(d) it will be necessary to determine the constitutional validity vel non of Chapter 87-6, Laws of Florida. The Justices of this Court have on other occasions responded to a request for an interpretation of the Governor's constitutional duties even though doing so required a determination of the constitutionality vel non of a legislative enactment, In re Advisory Opinion of the Governor Civil Rights, 306 So.2d 520 (1975) and In re Advisory Opinion to the Governor, 374 So.2d 959 (1979). In In re Advisory Opinion to the Governor, Governor Graham requested an opinion respecting his duty to appoint members of the judiciary pursuant to newly enacted legislation creating the Fifth District Court of Appeal and various other judicial positions. The Justices determined to answer Governor Graham's inquiry because `[t]o allow these questions to be raised by others after realignment of districts and appointment of judges, could be chaotic' 374 So.2d at 962.
"The consequences of this revenue source being invalidated are staggering. If judicial determination is delayed and the statute invalidated, it is foreseeable that no corrective action could be taken during the 1987-88 budget year so as to balance the budget. Moreover, if the taxes are collected and the statute or portions of it are invalidated, the liabilities created by refund claims would be severely disruptive of the state's finances.
"This is not simply a problem of preventing increases in state agency programs. Without the funds generated by the tax on the sale or use of services, there will be a shortfall of $232.2 million in funding a continuation budget. Thus, statewide programs would have to be cut and essential services curtailed.

*300 "The impact will be felt at all levels of government. For example, at least $53.5 million of the funds raised by this revenue source will flow to local governments under the terms of current law, Section 218.61, Florida Statutes. Uncertainty as to the ability to expend these and other funds will wreak havoc with local government capital outlay, not to mention the required capital improvement elements of the Local Government Comprehensive Plans.
"By virtue of the foregoing, I respectfully request the opinion of the Justices of the Supreme Court on the following question affecting my executive duties and responsibilities:
"Did the Legislature by enacting Chapter 87-6, Laws of Florida, validly create revenue sources from the tax imposed on the sale or use of services consumed or enjoyed in this State as enumerated therein or did it fail in that effort which will require me to propose a supplemental budget which either reduces state expenditures or attempts to identify and propose alternative sources of revenue so that the budget of this State will be in balance as dictated by Article VII, Section 1(d), Florida Constitution?"
Upon receiving your letter, the Justices, pursuant to article IV, section 1(c), Florida Constitution, and Florida Rule of Appellate Procedure 9.500(b)(1) entered an interlocutory order stating:
"His Excellency, the Governor of Florida, has requested the opinion of the justices of this Court on the following question:
"Did the Legislature by enacting Chapter 87-6, Laws of Florida, validly create revenue sources from the tax imposed on the sale or use of services consumed or enjoyed in this State as enumerated therein or did it fail in that effort which will require me to propose a supplemental budget which either reduces state expenditures or attempts to identify and propose alternative sources of revenue so that the budget of this State will be in balance as dictated by Article VII, Section 1(d), Florida Constitution?
"The full text of the Governor's letter is attached hereto as an exhibit and made a part hereof.
"It is the decision of the Court that this request is answerable under the above-noted section of the Constitution and we exercise our discretion to do so.
"It is, therefore, the order of the Court that those interested parties who contend that the aforesaid statute is unconstitutional shall file their briefs on or before May 29, 1987, and serve a copy thereof on the Governor and the Attorney General. Those parties supporting the constitutionality of the statute shall file their briefs on or before June 8, 1987, and serve a copy thereof on those parties who have filed a brief attacking the constitutionality of the tax. Reply briefs shall be filed on or before June 18, 1987. Oral argument is scheduled for 9:00 a.m. on Monday, June 22, 1987. All parties who have filed a brief shall have the opportunity of presenting oral argument. The amount of time allocated to each party will be determined after the filing of the briefs.
"It is so ordered."
Pursuant to this order, both proponents and opponents of chapter 87-6, Laws of Florida, filed briefs and this Court heard oral argument.
As a threshold matter, many of the parties who have filed briefs or appeared to argue their positions before this Court have called upon us to reconsider issuing an advisory opinion in this matter. The proponents of this view make two principal arguments in support of their position. First, they argue that you have asked this Court to rule on the validity of a statute and that such an opinion is beyond the Court's advisory power under article IV, section 1(c) of the Florida Constitution. Second, they argue that the issuance of an advisory opinion would be unwise because the Court has no facts or record upon which to base its ruling and because an advisory opinion could prejudice the effective resolution of future disputes between various taxpayers and the state. For the *301 reasons that follow, however, we adhere to our decision to render an advisory opinion.
Article IV, section 1(c) of the Florida Constitution provides in pertinent part that "[t]he governor may request in writing the opinion of the justices of the supreme court as to the interpretation of any portion of this constitution upon any question affecting his executive powers and duties." As reflected in your letter of May 12, 1987, set out above, article IV, section 1(a) of the Florida Constitution sets out the general obligations of the chief executive. Among these general obligations is the duty to ensure that the laws of the state are faithfully executed. A number of implicit fiscal responsibilities are inherently contained within this broad proviso of authority. Moreover, article VII, section 1(d), Florida Constitution, requires that the state raise sufficient revenue to balance Florida's budget for each fiscal period. This provision also impacts your fiscal responsibilities in a significant manner.
We agree with those who contend that article IV, section 1(c), Florida Constitution, does not generally empower this Court to issue advisory opinions concerning the validity of statutes enacted by the legislature. Thus, we are without power to render an advisory opinion regarding your statutory, as opposed to your constitutional, powers and duties. In re Advisory Opinion to the Governor, 225 So.2d 512, 514 (Fla. 1969). Nor does this provision generally authorize this Court to resolve questions concerning the legal rights and obligations of private parties. As we noted in In re Advisory Opinion to the Governor, 113 So.2d 703, 705 (1959):
This Court has many times declined to pass upon the constitutionality of a statute in rendering advisory opinions, particularly where such a test can best be accomplished in adversary proceedings appropriately briefed and buttressed by argument of counsel. This policy is the product of the historical recognition of the presumed constitutionality of an act of the Legislature until such presumption is set at rest by a court of competent jurisdiction in a proper adversarial proceeding.
Nevertheless, this Court has previously held that when a legislative enactment severely impacts the fiscal stability of the state, the enactment necessarily affects the chief executive's fiscal duties under the Florida Constitution. For example, in In re Advisory Opinion to the Governor, 243 So.2d 573, 576 (1971), this Court stated that due to the major impact that legislation creating a corporate income tax would have on the state, Governor Askew's fiscal duties under article IV, section 1(a), and article VII, section 1(d) of the Florida Constitution were necessarily affected. Thus, the Court found it appropriate to issue an advisory opinion concerning the constitutionality of such an enactment. We noted similar considerations when we examined the constitutionality of the 1970 General Appropriations Bill in In re Opinion to the Governor, 239 So.2d 1, 8-9 (Fla. 1970), in which we stated that "in view of the great public interest in maintaining the fiscal stability of state government, we have decided to answer your request." Therefore, in light of the potentially chaotic impact upon your constitutional duties as fiscal manager of Florida which could be caused by finding chapter 87-6 invalid, we find that sufficient authority exists to answer your inquiry.
Turning to the question of whether we should issue an advisory opinion on the tax law in question, we address the concerns of those opposing such an opinion by stressing its limited scope. First of all, advisory opinions are merely legal opinions of the individual justices, offered for the Governor's guidance in the performance of his or her constitutional duties. The opinions expressed in these advisory opinions do not constitute decisions of the Florida Supreme Court and, therefore, are not binding in any future judicial proceedings. In re Advisory Opinion of Governor Civil Rights, 306 So.2d 520, 523 (Fla. 1975); Amos v. Gunn, 84 Fla. 285, 321, 94 So. 615, 627 (1922). Moreover, because by nature an advisory opinion is rendered without the benefit of a record or a specific factual scenario, when such an opinion discusses *302 the constitutionality of a statute it is necessarily limited to the facial constitutionality of the enactment. Thus, in the case of the instant tax on the sales and use of services, any interested parties are free to initiate lawsuits to challenge the tax and are free to argue that this advisory opinion has either been wrongly decided or that the act is unconstitutional as applied to their particular situations. Our examination of chapter 87-6 is, therefore, limited to its facial validity and we will not address the validity of the law as applied to any particular set of facts.[1]
Significantly, we also find that the express language contained in article IV, section 1(c), Florida Constitution, precludes us from addressing federal constitutional issues as they relate to chapter 87-6 in this opinion. Although we understand your concern that a decision not to address these federal issues would reduce the adequacy of our advice to you, we find that the express language contained in article IV, section 1(c) authorizing us only to issue advisory opinions concerning your duties and powers under "any portion of this constitution" inescapably limits the scope of our opinion to questions arising under the Florida Constitution when the validity of a state statute affects your duties.[2] Moreover, we must acknowledge another practical justification for declining to address federal questions in this advisory opinion. Although this Court is the final arbiter of questions arising under the Florida Constitution, the United States Supreme Court is the final arbiter of federal constitutional law. Thus, this Court cannot address federal questions as authoritatively as it can state constitutional questions.

Part I. Taxation of Legal Services
We shall address the various challenges to the act roughly in the order set forth in your letter of May 12, 1987. Turning first to the imposition of the tax on legal services, we find that it does not facially constitute an unconstitutional burden on the right to legal counsel. Article I, section 16 of the Florida Constitution sets forth the rights of persons accused of crimes, one of which is the right to legal counsel. Opponents of the instant act argue that the right to counsel is a "preservative right" that safeguards many other constitutional rights and that, therefore, any burden on the exercise of that right is constitutionally impermissible. We do not, however, believe that this tax, on its face, burdens the constitutional right of access to counsel.
The right to counsel is violated only when access to an attorney is impeded or where the attorney's ability to consult with, advise, or defend his client is hindered. See United States v. Cronic, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984). The instant tax does not appear to have such an effect. Although the act does tax legal services under its general provisions, the act also exempts from taxation pro bono legal services and government counsel appointed for indigents.[3] Because of this exception, *303 the act only taxes those who can afford to retain counsel and pay the tax. This exemption distinguishes the instant tax on legal services from the poll tax declared unconstitutional in Harper v. Virginia State Board of Elections, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966). In Harper, every voter, regardless of financial ability, had to pay a $1.50 tax as a prerequisite to voting. Under such a system, an indigent person would be denied his right to vote should he or she be unable to pay the tax. The instant exemption prevents such a result.
For similar reasons, we also reject the contention that the act facially violates the constitutional right of access to the courts. Article I, section 21 of the Florida Constitution guarantees that the "courts shall be open to every person for redress of any injury, and justice shall be administered without sale, denial, or delay." Because those persons who cannot afford to pay legal fees will pay no tax, the act does not appear to bar any person from seeking redress for any injury in the courts. The imposition of the instant tax should, at least theoretically, no more violate this provision than would any other rise in the cost of legal fees.
Nor should the instant tax in any way constitute a "sale of justice." Art. I, § 21, Fla. Const. Clearly, the state can directly assess fees and costs for access to the court system only when such fees and costs are directly related to the administration of justice. Any such fees collected cannot be used for general revenue purposes. Farabee v. Board of Trustees, Lee County Law Library, 254 So.2d 1 (Fla. 1971). The instant act, however, does not impose a direct charge for the privilege of utilizing the courts. At most, the taxation of legal fees imposes a detached, incidental burden upon court access and it is not levied in exchange for access to the courts or to purchase justice.
We also find that the tax on legal fees does not facially violate the equal protection guarantee of article I, section 2 of the Florida Constitution. Moreover, legal services are taxed under the general taxing provision of the act and are not targeted for a separate discriminatory tax. See ch. 87-6, § 1, Laws of Fla. (creating § 212.059, Fla. Stat.). Thus, the strict judicial scrutiny required for enactments which impinge upon fundamental rights or discriminate against certain taxpayers is not triggered. The individual exemptions provided for certain types of legal services do not alter the act's overall character.[4] Although the state must adhere to the principles of due process and equal protection when exercising its taxing power, those principles do not impose an ironclad rule of equality. The state must be allowed the flexibility and variety appropriate to taxation schemes. Kahn v. Shevin, 416 U.S. 351, 94 S.Ct. 1734, 40 L.Ed.2d 189 (1974). Accordingly, the state is accorded a wide range of discretion when classifying for taxation purposes, provided that the classification is reasonable, nonarbitrary, and rests on some ground of difference having a fair and substantial relation to the object of the legislation. State ex rel. Vars v. Knott, 135 Fla. 206, 184 So. 752 (1938), appeal dismissed, 308 U.S. 506, 60 S.Ct. 72, 84 L.Ed.2d 433 (1939), vacated on other grounds, 308 U.S. 507, 60 S.Ct 72, 84 L.Ed. 434 (1939). We cannot say that the distinctions which the act draws are arbitrary. Rather, the exemptions granted for legal services provided to indigents, government, nonprofit entities, and employers are necessary for consistency with the overall act. Likewise, the exemptions are necessary in order to satisfy either constitutional requirements or social policy considerations. Accordingly, we find that the taxation scheme as it applies to legal services is reasonable and rationally related to the legitimate state purposes of raising revenue without doing violence to either the Constitution or important social policies.
We do wish to express our concern, however, about the method set forth in section 212.0592(27)(a) for determining when taxes on legal services will be paid in criminal *304 cases. Section 212.0592(27)(a) creates an exemption for:
Legal services rendered by an attorney to a client to the extent that the right to counsel is guaranteed pursuant to either the Sixth Amendment to the United States Constitution or Article I, Section 16 of the Florida Constitution is applicable to such legal services. However, this exemption shall only be applicable if the criminal charges brought in this case are dismissed or the client is ultimately adjudicated not guilty by a court of competent jurisdiction. This exemption shall only be granted pursuant to a refund of taxes previously paid on such services.
Ch. 87-6, § 3, Laws of Fla. Accordingly, the legislature has created a system under which, in order to be eligible for a refund, the suspect must actually be charged with criminal activity and wholly exonerated on all charges. Some question the appropriateness of giving the state a direct financial interest in whether a suspect is charged and convicted. Although we do not believe that this aspect of the tax is facially unconstitutional, such equal protection questions are fact specific and the true test of this provision will come if individual defendants should challenge the limiting language in the second sentence of subsection (27)(a) as applied to them. Nevertheless, though some may believe that basing taxation decisions upon whether one is charged and convicted for a crime is extremely unwise, it is not within the province of this or any other court to base a determination of statutory validity on our view of the particular enactment's wisdom absent a violation of constitutional guaranties. State v. Yu, 400 So.2d 762 (Fla. 1981), appeal dismissed, Wall v. Florida, 454 U.S. 1134, 102 S.Ct. 988, 71 L.Ed.2d 286 (1982); Fraternal Order of Police, Metropolitan Dade County, Lodge No. 6 v. Department of State, 392 So.2d 1296 (Fla. 1980).

Part II. Due Process and Equal Protection
Opponents of chapter 87-6 have expressed a number of other due process and equal protection concerns regarding the statute at bar. Of course, as we noted above, due process and equal protection concerns are inherently fact specific and, therefore, cannot be comprehensively addressed in this opinion. Representatives of three groups of businesses, however, have lodged facial challenges to the act on due process and equal protection grounds. We believe some, but not all, of these challenges are amenable to adequate analysis in this advisory opinion and we shall, therefore, examine each in turn.

A. Exemption 35
Representatives of the data processing industry charge that the exemption contained in the newly created section 212.0592(35) of the Florida Statutes (exemption 35) violates equal protection because it fails to treat all persons and businesses similarly circumstanced alike. Ch. 87-6, § 3, Laws of Fla. Exemption 35 exempts from taxation certain service corporations that perform data processing services for financial institutions described in group 61 of the Standard Industrial Classification Manual (SIC).[5] In order to qualify for the exemption, the service corporation must meet several criteria, including that it be organized pursuant to section 545.74 of the rules of the Federal Home Loan Bank Board, that its capital stock be purchased only by savings and loan associations operating within the state, and that those savings and loans or savings banks satisfy certain percentage ownership requirements. Ch. 87-6, § 3, Laws of Fla.
Two data processing businesses that do not satisfy these criteria advance the equal protection argument that this exemption arbitrarily distinguishes between data processing services owned by savings and loans and those owned by other entities. *305 This is the type of issue that should not be addressed in an advisory opinion. A decision on this claim has little or no adverse fiscal impact on the Governor's functions. Moreover, addressing the propriety of exemption 35 would amount to an adjudication of the legal rights and obligations of private parties. Hence, this issue should be resolved by private litigation of the directly affected parties.

B. Newspapers and Advertisers
Representatives of the advertising industry and the press argue that the act violates equal protection principals by reclassifying the sales of newspapers and advertising as nonessential goods and singling out the sale of those items for discriminatory taxation. We note first that the classification of an item as essential or nonessential has no constitutional significance. The government can tax essential goods and services, such as food, medicine, gasoline, or electricity if it chooses to do so. See Puget Sound Power & Light Co. v. City of Seattle, 291 U.S. 619, 54 S.Ct. 542, 78 L.Ed. 1025 (1934) (approving a license tax on electricity). Therefore, whether the act classifies advertising and newspapers as essential or nonessential is wholly irrelevant.
Nor do we view chapter 87-6 as singling out either advertisers or the press for discriminatory treatment. Advertising is taxed under the same general taxation provision of the act that imposes a tax on all other nonexempt services. Ch. 87-6, § 1, Laws of Fla. (creating § 212.059, Fla. Stat.). Although newly created section 212.0595 of the Florida Statutes sets out a number of special provisions relating to the collection and apportionment of the tax as applied to the advertising industry, these rules do not themselves impose any additional tax obligations. Rather, they simply set out the specific clarifying rules that the peculiar nature of modern interstate advertising necessitates.
We also disagree that the act facially discriminates against the advertising industry as a whole by placing upon it a disproportionate tax burden. As the state points out, the taxation of advertising is expected to account for only 4.7% of all revenues derived from the new sales and use tax on services. The revenues derived from the taxation of advertising services is projected to account for only 1.4% of the total tax revenues derived from chapter 212 of the Florida Statutes during the 1987-88 fiscal year. We cannot say that, on its face, this smacks of discrimination.
Opponents of the tax on advertising also argue that the act violates due process by failing to fairly apportion the tax for interstate advertisers and by attempting to tax advertisers who have no significant nexus to Florida. Questions such as this, however, are wholly fact specific and we cannot answer them by a facial examination of the statute based on hypothetical fact patterns. Thus, this type of due process challenge must await a specific "as applied" challenge in an adversarial setting.[6]

C. The Construction Industry
Representatives of the construction industry argue that the act violates due process because it fails to define "essential services" for purposes of tax exemption and because the exemptions listed in newly created section 212.0592 are unconstitutionally arbitrary. Ch. 87-6, § 3, Laws of Fla. Because, as we stated above, the essential nature of an item bears no relation to its taxability, we find any purported vagueness in the definition of "essential services" to be wholly irrelevant. Moreover, as counsel for the legislature pointed out during oral argument, the legislative process is a political one. Many of the exemptions that opponents of the act single out as examples of arbitrariness were enacted in order either to minimize the regressive nature of tax or to address the specific concerns of organizations that the general taxing *306 mechanism affected. Thus, we cannot say that the exemptions listed in section 212.0592 are unconstitutionally arbitrary or unreasonable.

Part III. Freedom of Speech and Press
Opponents of the statute have raised various arguments pursuant to the freedom of speech and press guarantees of article I, section 4 of the Florida Constitution. We shall address each argument separately.

A. Registration Requirements of Chapter 87-6
Addressing first the requirement that all persons who purchase advertising out-of-state for consumption in Florida report to the state, self-accrue the tax, and then remit the tax directly to the state, we reject the argument that these requirements constitute an unconstitutional registration requirement. See ch. 87-6, §§ 6 (creating § 212.0595(6), Fla. Stat.), 12 (amending § 212.06(2)(k), Fla. Stat.), & 16 (amending § 212.11(1), Fla. Stat.), Laws of Fla. Although opponents of these requirements contend that Talley v. California, 362 U.S. 60, 80 S.Ct. 536, 4 L.Ed.2d 559 (1960), prohibits such registration, we cannot agree. Tally involved an ordinance forbidding the distribution of all handbills that did not contain the name of the printer, author or manufacturer, and distributor. Although the City of Los Angeles urged that it had carefully aimed the law solely at identifying those responsible for fraud, false advertising, and libel, the United States Supreme Court disagreed. Id. at 63-64, 80 S.Ct. at 538-39.
While Tally did stress the historical importance of anonymity, it struck down the ordinance solely due to its overreaching nature. Unlike the ordinance at issue in Tally, however, we do not view the instant disclosure requirement to be unduly intrusive on its face. Realism dictates that the state have some method of enforcing the instant tax. Prohibiting the state from requiring a given group of taxpayers to identify taxable transactions would place an unreasonable and unrealistic burden on the Department of Revenue (DOR) and would no doubt result in an uneven and haphazard enforcement of the tax code. We believe that, on its face, the registration provisions contained in chapter 87-6 are drawn in a sufficiently limited manner to pass constitutional muster. The DOR should, however, exercise caution in promulgating regulations pursuant to this statutory authority to ensure that its provisions remain limited to furthering the state's interest in identifying taxable transactions.

B. Content-based Taxation and the Taxation of Fundamental Rights
Opponents of the tax also argue that chapter 87-6 constitutes a direct tax on the exercise of the constitutional right to free speech. As we pointed out during our previous discussion of the equal protection concerns of advertisers and the press, however, this tax on the sale and use of services is one of general application and does not single out advertisers or the press for special taxation. Moreover, as will be discussed in more detail later, the tax is levied upon those in the business of trafficking in first amendment expression rather than upon the exercise of the right to free speech itself.[7] It is beyond question that advertisers and the press are not immune from ordinary, nondiscriminatory taxes of general application. Arkansas Writers' Project, Inc. v. Ragland, ___ U.S. ___, ___, 107 S.Ct. 1722, 1725, 95 L.Ed.2d 209 (1987); Minneapolis Star and Tribune Co. v. Minnesota Commissioner of Revenue, 460 U.S. 575, 581, 103 S.Ct. 1365, 1369, 75 L.Ed.2d 295 (1983); Grosjean v. American Press Co., 297 U.S. 233, 250, 56 S.Ct. 444, 449, 80 L.Ed. 660 (1936). Therefore, we reject the argument that the instant tax is directly and discriminatory aimed at the exercise of the constitutional right of free speech.
Opponents of the act also argue, however, that the instant tax targets the press *307 and discriminates based on the content of the speech involved. Proponents of this view cite to Arkansas Writers' Project, Inc., Minneapolis Star, and Grosjean in support of this view. We find, however, significant contrasts between chapter 87-6 and those tax schemes struck down in these three cases. Indeed, rather than support the opponents' arguments, we believe that these three cases support the facial constitutionality of the statute.
In Grosjean, Louisiana enacted a license tax that only applied to publications within the state of Louisiana with a circulation of more than 20,000 copies per week. Due to the narrow scope of the statute, the law taxed only thirteen newspapers out of the more than 124 publishers in the state. Minneapolis Star, 460 U.S. at 579, 103 S.Ct. at 1368. In striking down the law, the United States Supreme Court rejected the state's argument that the law imposed a license tax for the privilege of selling or charging for advertising. Instead, the Court found the law to be a deliberate and calculated effort, in the guise of a tax, to penalize certain publishers and to limit the circulation of a selected group of newspapers.[8]
Over four decades later, in Minneapolis Star, the Supreme Court struck down a "use tax" on the cost of ink and paper products consumed in the production of publications. 460 U.S. at 577, 103 S.Ct. at 1367. In a situation similar to that encountered in Grosjean, the use tax in Minneapolis Star was drawn so narrowly that it applied only to fourteen out of the 388 paid circulation newspapers in Minnesota.[9] Attaching significance to the fact that Minnesota had deliberately chosen not to apply its general sales and use tax to newspapers and had, instead, enacted a separate special tax applicable only to the press, the Court struck down the special use tax as facially discriminatory. In doing so, the Court made the following observation:
A power to tax differentially, as opposed to a power to tax generally, gives a government a powerful weapon against the taxpayer selected. When the State imposes a generally applicable tax, there is little cause for concern. We need not fear that a government will destroy a selected group of taxpayers by burdensome taxation if it must impose the same burden on the rest of its constituency.
... .
The main interest asserted by Minnesota in this case is the raising of revenue. Of course that interest is critical to any government. Standing alone, however, it cannot justify the special treatment of the press, for an alternative means of achieving the same interest without raising concerns under the First Amendment is clearly available: the State could raise the revenue by taxing business generally... .
460 U.S. at 585-86, 103 S.Ct. at 1371-72. Of perhaps even greater significance to the situation before this Court, the Supreme Court specifically rejected one newspaper's argument that a generally applicable sales tax would be unconstitutional, concluding that "our cases have consistently recognized that nondiscriminatory taxes on the receipts or income of newspapers would be permissible." 460 U.S. at 587 n. 9, 103 S.Ct. at 1373 n. 9.
This latter conclusion was reemphasized in Arkansas Writers' Project, ___ U.S. at ___, 107 S.Ct. at 1727. In Arkansas Writers' Project, the Supreme Court found that the Arkansas sales tax selectively taxed some magazines and not others based solely on content. Accordingly, the Court struck down the tax law, which exempted from taxation "religious, professional, *308 trade and sports journals and/or publications printed and published within ... [Arkansas] when sold through regular subscriptions" as unconstitutionally discriminative of publications based on content. Id. at ___ & ___, 107 S.Ct. at 1724 & 1729. The Court, however, reemphasized that genuinely nondiscriminatory taxes on newspaper receipts are constitutionally permissible.
We find the instant tax to be facially consistent with both the letter and the spirit of these three cases. Unlike the statute considered in Grosjean and Minneapolis Star, chapter 87-6 does not impact only a select few advertisers or publications. Moreover, not only does it apply to the overall industries, it is part of the same general sales tax provision that will apply to all other nonexempt businesses involved in the sale or use of services in Florida. Thus, the instant tax is wholly dissimilar to the use tax on ink and paper considered in Minneapolis Star. Indeed, the instant tax does exactly what the Supreme Court approved and criticized Minnesota for failing to do, i.e., extend the general sales tax to the press.
Nor do we believe the instant tax to be similar to the tax struck down in Arkansas Writers' Project. Newly created section 212.08(7)(o)1 of the Florida Statutes exempts sales and leases to religious, scientific, educational, and other nonprofit institutions from the sales tax when those transactions are in the furtherance of their customary nonprofit functions. Ch. 87-6, § 14, Laws of Fla. This exemption, among other things, leaves intact the preexisting comprehensive exemption for the use, sale and distribution of religious publications. § 212.06(9), Fla. Stat. (Supp. 1986). Moreover, the general sales tax exemption for government, nonprofit institutions, and religious organizations predates chapter 87-6, which merely extends this exemption to cover the newly taxed services. See § 212.08(6) & (7), Fla. Stat. (1985).
We disagree with opponents of the law that the act unconstitutionally discriminates between publications based on content. Notably, prior to the enactment of chapter 87-6, some commercial advertisements were exempt from taxation of the sale and use of goods while others were not.[10] Additionally, magazines sold at newsstands were taxed while newspapers were not. Thus, in at least some ways, the instant enactment serves to eliminate content-based discrimination rather than create it. Moreover, the institutions exempted from taxation under section 212.08(7)(o)1 are not exempted solely from the taxation of publications and advertisements which they purchase and disseminate. Rather, they are exempted from taxation for all their transactions that would otherwise be taxable under a sales and use tax on goods and services. Therefore, unlike the tax law at issue in Arkansas Writers' Project, the instant law does not require an evaluation of a publication's content in order to determine its status for taxation purposes.
In the case of the exemption granted to government entities, contained under section 212.08(6), Florida Statutes, as amended by the act, we find that both law and common sense require this provision. The federal government is constitutionally immune from taxation. Also, taxing the state government or its subdivisions to raise revenues to fund the operation of state government would be nonsensical and circuitous. In the case of religious institutions, the exemption is wholly consistent with the sort of "benevolent neutrality" that is constitutionally required. Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Amos, ___ U.S. ___, ___, 107 S.Ct. 2862, 2867, 97 L.Ed.2d 273 (1987); Walz v. Tax Commission, 397 U.S. 664, 678, 90 S.Ct. 1409, 1416, 25 L.Ed.2d 697 (1970). We believe that the instant exemption from taxation as applied to religious *309 institutions serves the "permissible legislative purpose [of alleviating] significant governmental interference with the ability of religious organizations to define and carry out religious missions" without advancing religion through state activities and influence. Corporation of the Presiding Bishop, ___ U.S. at ___, 107 S.Ct. at 2868. Nor are we persuaded that the tax exemption for a select few types of motion picture productions makes the rest of the media selected targets of discriminatory taxation. Thus, the press' tax burden is not discriminatorily based on content and the strict scrutiny test is not triggered. We believe these exemptions set forth in the act are, at the very least, rationally related to the furtherance of important social policies and, therefore, constitutionally permissible.
In light of the above, we do not find that chapter 87-6 facially violates the freedom of speech and press guarantees contained in article I, section 4 of the Florida Constitution.[11]

Part IV. Chapter 87-6 as an Income Tax
Those opponents of the sales and use tax on services contained in chapter 87-6 who believe the enactment constitutes an income tax argue that the tax treats the right to work and earn a livelihood by engaging in the business of selling services as a taxable privilege and that, therefore, the act constitutes the type of tax prohibited by article VII, section 5, Florida Constitution. We find this analysis to be oversimplistic.
We first note that this Court has previously upheld the imposition of a gross receipts tax on businesses. In Gaulden v. Kirk, 47 So.2d 567 (Fla. 1950), the legislature had enacted, as part of the Florida Revenue Act of 1949, a tax upon persons engaging in the business of renting, leasing, or letting any living quarters, sleeping accommodation, or housing accommodation. 47 So.2d at 570. The tax was based on a percentage of the gross rentals charged for the accommodations. Gaulden operated a facility taxed under this provision and the Palm Beach County sheriff arrested him for refusing to pay the tax. This Court upheld the tax, finding the enactment to constitute a valid gross receipts tax on the privilege of engaging in the business of renting such accommodations. Id. at 576.
Four years later, in Volusia County Kennel Club v. Haggard, 73 So.2d 884 (Fla.), cert. denied, 348 U.S. 865, 75 S.Ct. 87, 99 L.Ed. 681 (1954), this Court addressed the constitutionality of a tax on the daily gross receipts from gambling operations at dog racing tracks. Although the Court struck down the tax due to its arbitrary classification scheme, the Court rejected the argument that the tax amounted to an unconstitutional income tax, finding instead that the enactment constituted an excise tax upon the privilege of operating dog racing tracks in Florida. Id. at 886. The Court found the legislature's desire to base the tax on the amount of revenues collected to be both reasonable and constitutionally permissible. Id. at 887.
We can see no meaningful difference between the taxes upheld in Gaulden and Volusia County Kennel Club and the tax before us now. As were the taxes approved in these two cases, the instant tax is levied upon the privilege of engaging in the occupation or business of selling services and is measured by the gross receipts derived therefrom. See also City of Lakeland v. Amos, 106 Fla. 873, 143 So. 744 (1932) (gross receipts tax on the privilege of selling electricity did not constitute *310 an income tax). By its express language, the act imposes an excise tax upon the sale and use of services in Florida, not upon income. Ch. 87-6, § 1, Laws of Fla. Moreover, the tax has none of the vestiges of an ordinary income tax. First, it exempts from taxation the services that employees render to their employers and the services that partners supply to their partnerships. Ch. 87-6, § 3, Laws of Fla. (creating § 212.0592(2) & (4), Fla. Stat.). This provision effectively eliminates typical wages and salaries from taxation. Thus, the tax base that the instant act creates is inconsistent with the tax base of a traditional income tax. Moreover, the tax is wholly transactional in nature and makes no reference to profit or net income, a factor this Court found significant in analyzing the tax scheme considered in Amos, 106 Fla. at 878, 143 So. at 747. Indeed, at least one of the act's opponents acknowledge that this Court would have to recede from both Volusia County Kennel Club and Gaulden in order to conclude that chapter 87-6 constitutes a facially unconstitutional income tax. Even assuming we could so recede from precedent in an advisory opinion, no such action would be warranted.
We agree with the opponents of the act that the true economic impact of a tax is what ultimately determines its nature. Owens v. Fosdick, 153 Fla. 17, 13 So.2d 700 (1943); State ex rel. McKay v. Keller, 140 Fla. 346, 191 So. 542 (1939). For the reasons stated above, however, we do not believe that chapter 87-6 has the realistic economic effect of creating an income tax. The act's treatment of prime contractors as the final consumer of new construction does not alter this conclusion. See ch. 87-6, § 5, Laws of Fla. (creating § 212.0594(3), Fla. Stat.). As to the argument that the act imposes an income tax upon the class of injured Floridians seeking judicial redress for lost earnings, we point out that section 42 of the act allows prevailing plaintiffs to recover any applicable sales or use tax due on legal fees from the defendant. Ch. 87-6, § 42, Laws of Fla. (amending § 57.071(3), Fla. Stat.). We believe that this provision effectively rebuts this facial challenge to the act.
Finally, representatives of the construction industry argue that the act subjects prime contractors to double taxation.[12] Although the effect of chapter 87-6 at various levels in the stream of commerce may be a pyramiding of taxes, no unconstitutional double taxation occurs where there are two taxpayers and two separate taxable transactions or privileges. Ryder Truck Rental, Inc. v. Bryant, 170 So.2d 822 (Fla. 1964); American Video Corp. v. Lewis, 389 So.2d 1059 (Fla. 1st DCA 1980). Despite the industry's arguments to the contrary, and although the prime contractor collects and remits taxes for both his purchases from the subcontractors and his eventual sale to the ultimate purchaser, the pyramiding of taxes complained of appears to occur due to separate taxable transactions. We do not believe that the case law discouraging double taxation was intended to address such a situation.[13]
In short, we do not view the instant tax on services to be fundamentally different in nature from the sales tax on goods, an enactment long recognized as a constitutional tax on the privilege of engaging in a *311 business or occupation. Ryder Truck Rental, 170 So.2d at 825.

Part V. Separation of Powers
Opponents of the instant tax law argue that chapter 87-6 violates article II, section 3 of the Florida Constitution, which mandates that "[n]o person belonging to one branch shall exercise any powers appertaining to either of the other branches unless expressly provided herein." Among other things, this provision prohibits the legislature from assigning its constitutional duties to administrative agencies within the executive branch such as the DOR. Florida State Board of Architecture v. Wasserman, 377 So.2d 653 (Fla. 1979). This nondelegation of duties doctrine places strict limitations on administrative agencies. In particular:
Under this doctrine fundamental and primary policy decisions shall be made by members of the legislature who are elected to perform those tasks, and administration of legislative programs must be pursuant to some minimal standards and guidelines ascertainable by reference to the enactment establishing the program.
Askew v. Cross Key Waterways, 372 So.2d 913, 925 (Fla. 1978).
Pursuant to this doctrine, statutes granting enforcement power to executive agencies such as the DOR must clearly set out adequate standards to guide the agency in the execution of the powers delegated and must define those powers with sufficient clarity to preclude the agency from acting through whim, favoritism, or unbridled discretion. Lewis v. Bank of Pasco County, 346 So.2d 53 (Fla. 1977); Flesch v. Metropolitan Dade County, 240 So.2d 504 (Fla. 3d DCA 1970), cert. denied, 244 So.2d 432 (Fla. 1971). The legislature, however, may validly delegate to agency officials the authority to promulgate subordinate rules within proscribed limits and to determine the facts to which established policies of legislation are to apply so long as the agency is not delegated the authority to determine what the law shall be. Sarasota County v. Barg, 302 So.2d 737 (Fla. 1974); Florida Welding & Erection Service, Inc. v. American Mutual Insurance Co., 285 So.2d 386 (Fla. 1973). The crucial inquiry in the case at hand is whether the statute is so couched in vague and uncertain terms or is so broad in scope that no one can say with certainty, from the terms of the law itself, who or what is to be taxed. See Miami Dolphins, Ltd. v. Metropolitan Dade County, 394 So.2d 981, 987 (Fla. 1981); Barg, 302 So.2d at 742.
Opponents of the act charge that the legislature violates the nondelegation doctrine by granting the DOR authority to determine what is to be taxed. Specifically, the opponents allege that the legislature unconstitutionally shifted to the DOR the power to define such crucial definitions as "advertising," "market coverage," "fair," and the like. They also contend that the legislature cannot constitutionally delegate the power to make apportionment decisions and to determine in which state the benefits of a service are enjoyed.
We do not believe that the instant act so lacks guidelines that neither the DOR nor the courts can determine which services the legislature intended to tax. The specificity with which the legislature must set out statutory standards and guidelines may depend upon the subject matter dealt with and the degree of difficulty involved in articulating finite standards. The same conditions that may operate to make direct legislative control impractical or ineffective may also, for the same reasons, make the drafting of detailed or specific legislation for the guidance of administrative agencies impractical or undesirable. State, Department of Citrus v. Griffin, 239 So.2d 577 (Fla. 1970); Burgess v. Florida Department of Commerce, 436 So.2d 356 (Fla. 1st DCA 1983), review denied, 447 So.2d 885 (Fla. 1984). In the context of a comprehensive taxation statute extending Florida's sales and use tax to the majority of services marketed in the state, courts cannot realistically require the legislature to dictate every conceivable application of the law down to the most minute detail. As we noted in Microtel, Inc. v. Florida Public Service Commission, 464 So.2d 1189, 1191 (Fla. 1985), the *312 subordinate factors in complex areas such as taxation should be left to the appropriate agency having expertise and flexibility. Otherwise, the legislature would be forced to remain in perpetual session and devote a large portion of its time to regulation. Id.
We do not believe the legislature doomed the viability of chapter 87-6 by failing to define such terms as "advertising" and "market coverage." The definition of advertising has a fixed and definite meaning within the industry. See Griffin, 239 So.2d at 582; Conner v. Joe Hatton, Inc., 216 So.2d 209, 212 (Fla. 1968). Moreover, further guidance can be gleaned from an examination of the SIC manual, which contains descriptions of taxed services, including such items as advertising agency services, outdoor advertising services, advertising representative services, and the like. Indeed, section 212.02(22) of the act specifically incorporates by reference the SIC manual in defining various types of services which touch on advertising. Ch. 87-6, § 7, Laws of Fla. As for "market coverage," newly created section 212.0595(4)(b) of the act expressly defines the term. Ch. 87-6, § 6, Laws of Fla. The fact that opponents of the act disagree with the appropriateness of the definition does not trigger a delegation problem. For like reasons, we reject the argument that other challenged terms are so ambiguous as to cause facial unconstitutionality.[14]
Turning to the argument that the statute unconstitutionally delegates power to the DOR in apportionment decisions concerning advertising, we find that section 212.0595 sets out the apportionment mechanism with sufficient specificity and clarity to guide the DOR as to the legislature's intent. Thus, we find that the provision passes facial scrutiny. We qualify this conclusion, however, by stressing that determinations as to the validity of tax apportionment schemes and nexus requirements are fact specific and ultimately can only be adequately adjudicated as applied to specific situations and taxpayers.

Part VI. Single Subject Requirement
Several opponents of the act contend that the statute violates article III, section 6 of the Florida Constitution, which provides that "[e]very law shall embrace but one subject and matter properly connected therewith, and the subject shall be briefly expressed in the title." In essence, these parties argue that because chapter 87-6 is a single statute that attempts to create a comprehensive taxation scheme for services, the chapter runs directly afoul of our decision in Gaulden v. Kirk. In Gaulden, this Court examined the Florida Revenue Act of 1949, section 24 of which made the effective date of the act dependent upon the passage and vitality of two other separate acts. 47 So.2d at 567. In that case, Gaulden argued that this resulted in an integration of the separate laws, thereby triggering a violation of the single subject rule. This Court, however, rejected that argument, holding that "[t]he fact it is an act which was passed as part and parcel of a comprehensive tax program devised by the legislature in the exercise of its lawmaking power, makes it none the less a single law within the purview of Section 16, Article III" and adding that "the legislature could not perform its duties or measure up to its responsibilities if we were to give the narrow construction [of the single subject rule] suggested by counsel." Id. at 575. The opinion also added the following dicta:
No single law could possibly be invented which would meet constitutional requirements and at the same time contain all the essential features of a comprehensive legislative program on any subject which affects the general welfare as vitally as does taxation. The legislature pursued the only available course since its program necessarily involved a consideration of the tax structure not only of the state but also its multiple political subdivisions and quasi-independent governmental *313 units within its borders in the interest of the welfare of its citizens as a whole. A legislative program of such magnitude may necessarily involve several subjects before the ultimate end effect can be accomplished. It was essential, therefore, in enacting its program that the legislature provide a separate law for each subject with which it dealt.
Id. (emphasis in original). Although we acknowledge that the instant act does seem to contravene this dicta, we point out that case law interpreting Florida's single subject rule has progressed since 1947 and that this Court has significantly refined the requirements necessary for a legislative enactment to satisfy the single subject requirement.
The single subject rule has a twofold purpose. First, it attempts to avoid surprise or fraud by ensuring that both the public and the legislators involved receive fair and reasonable notice of the contents of a proposed act. Santos v. State, 380 So.2d 1284 (Fla. 1980); Coldewey v. Board of Public Instruction, 189 So.2d 878 (Fla. 1966); King Kole, Inc. v. Bryant, 178 So.2d 2 (Fla. 1965). Secondly, the limitation prevents hodgepodge, logrolling legislation. E.g., King Kole, 178 So.2d at 4. As we recently stated in Smith v. Department of Insurance, 507 So.2d 1080, 1085 (Fla. 1987), quoting State v. Lee, 356 So.2d 276, 282 (Fla. 1978):
The purpose of the constitutional prohibition against a plurality of subjects in a single legislative act is to prevent a single enactment from becoming a "cloak" for dissimilar legislation having no necessary or appropriate connection with the subject matter.
Thus, as confirmed by our treatment in Smith of the Tort Reform and Insurance Act of 1986, the fact that the scope of a legislative enactment is broad and comprehensive is not fatal under the single subject rule so long as the matters included in the enactment have a natural or logical connection. Smith, at 1085. See also Chenoweth v. Kemp, 396 So.2d 1122, 1124 (Fla. 1981). In the case at bar, all the provisions contained within text of the statute have a logical and natural connection with the taxation of services in this state. Although at least one opponent has challenged section 201.15 of the act because it sets out an allocation scheme for the state treasury to use once it begins receiving revenues from the tax, we find this provision wholly instructional and necessarily incidental to the tax itself. Ch. 87-6, § 35, Laws of Fla. See Smith, at 1086 (provisions that are necessary incidents to or tend to make effective or promote the objects and purposes of the subject legislation do not violate the single subject rule). We do not find it to be the type of specific appropriation that would trigger a violation of the single subject rule. Accordingly, we do not find chapter 87-6 violative of the single subject rule.

Part VII. Contract Clause
The final contention that we shall address is the argument that the provisions contained in chapter 87-6 dealing with the construction industry violate article I, section 10 of the Florida Constitution. This provision provides that "[n]o bill of attainder, ex post facto law or law impairing the obligation of contracts shall be passed." Representatives of the construction industry argue that the interaction of section 5 of the act, which creates section 212.0594 of the Florida Statutes, and section 31 of the law act in concert to impair construction contracts in existence prior to the statute's enactment. See Ch. 87-6, §§ 5 & 31, Laws of Fla. We agree.
Newly created sections 212.0594(6) and (8) of the Florida Statutes, contained in section 5 of the act, impose a tax upon prime contractors for both certain services that subcontractors supply and on the cost price of the construction that eventually results.[15] The tax on the latter construction *314 is due at the time that either the contract for new construction is fulfilled or when the certificate of occupancy is issued, whichever occurs first. Ch. 87-6, § 5, Laws of Fla. (creating § 212.0592(8), Fla. Stat.). Section 31 of the act, however, provides:
Notwithstanding any other provision of this act, in the case of written contracts which are signed prior to May 1, 1987, for constructing improvements to real property, prime contractors ... responsible for performing the contract shall not be required to remit any tax on services levied pursuant to s. 212.059 or s. 212.0594, Florida Statutes, provided that:
... .
(4) The purchase of the service occurs before June 30, 1988.
Ch. 87-6, § 31, Laws of Fla.
Reading these two sections in pari materia, section 31 creates an exemption to the taxation provisions of section 5 for written construction contracts signed prior to May 1, 1987. Under section 31(4), however, this exemption expires if the contractor's performance under the contract is not fully rendered prior to June 30, 1988. Thus, if the contractor fails to complete construction and obtain a certificate of occupancy before that date, the general taxation provisions of section 212.0594, Florida Statutes, are resurrected and applied to the contract even though it was signed prior to May 1, 1987.
The legislature filed the instant statute on April 23, 1987, and the Governor signed it into law on the following day. Once enacted into law, contractors were placed on notice that they should take their upcoming tax burden into consideration when entering into construction contracts after May 1, 1987. The act, however, does not limit its effect to this permissible burden. Instead, by retroactively placing a tax burden upon all construction contracts that are incomplete by June 30, 1988, and thereby adding an unknown, uncontemplated cost, it retroactively burdens contracts that were in existence before any party could have reasonably been on notice of the impending tax.
Unquestionably, contract rights are ordinarily subject to the state's powers of taxation. Straughn v. Camp, 293 So.2d 689 (Fla.), appeal dismissed, 419 U.S. 891, 95 S.Ct. 168, 42 L.Ed.2d 135 (1974). It is equally indisputable, however, that rights existing under a valid contract enjoy protection under the Florida Constitution. Green v. Quincy State Bank, 368 So.2d 451 (Fla. 1st DCA 1979). We cannot accept the state's argument that the fact the instant tax may make certain contracts unprofitable does not constitute an impairment of contract. Any legislative action which diminishes the value of a contract is repugnant to and inhibited by the Constitution. Dewberry v. Auto-Owners Insurance Co., 363 So.2d 1077 (Fla. 1978). A statute which retroactively turns otherwise *315 profitable contracts into losing propositions is clearly such a prohibited enactment. Thus, it is our opinion that section 31(4) of the statute is facially unconstitutional.
In summation, we emphasize that an advisory opinion is for the benefit of the chief executive and, therefore, does not carry with it the mandate of the Court. Moreover, the scope of our advisory authority prevents us from considering either federal constitutional questions or the constitutionality of the statute as applied to specific factual scenarios and individual taxpayers. Nevertheless, it is our opinion that, with the exception of section 31(4), chapter 87-6 is facially constitutional.
 Respectfully,
 Parker Lee McDonald
 Chief Justice
 Ben F. Overton
 Leander J. Shaw, Jr.
 Gerald Kogan
 Justices
A concurring and dissenting view by Justice GRIMES.
While I concur with all other aspects of the opinion, I believe that the tax on advertising represents an unconstitutional restraint on free speech.
Article I, section 4 of the Florida Constitution provides in part:
Every person may speak, write and publish his sentiments on all subjects but shall be responsible for the abuse of that right. No law shall be passed to restrain or abridge the liberty of speech or of the press.
The scope of the protection accorded to speech under article I, section 4, is at least the same as that granted by the first amendment of the federal Constitution as interpreted by the United States Supreme Court. Department of Education v. Lewis, 416 So.2d 455 (Fla. 1982).
The fact that advertising usually involves commercial speech does not necessarily diminish the first amendment interests involved. Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc., 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976). So long as advertisements are not misleading and concern a lawful activity, they are entitled to first amendment protection. Central Hudson Gas & Electric Corp. v. Public Service Commission, 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980). Moreover, advertising is used to convey political and social views. As noted in New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), advertisements are:
[A]n important outlet for the promulgation of information and ideas by persons who do not themselves have access to publishing facilities  who wish to exercise their freedom of speech even though they are not members of the press.
Id. at 266, 84 S.Ct. at 718.
The question then is whether the advertising tax represents a tax on the right to speak. The new law itself suggests the answer when it defines advertising as "the service of conveying the advertiser's message," i.e., the dissemination of information itself. § 212.0595(10). Payment of the tax is a condition of speaking to the Florida public through the media.
The United States Supreme Court has at least implied that a nondiscriminatory sales tax on publications which is simply part of the larger taxing scheme would be constitutional. Minneapolis Star & Tribune Co. v. Minnesota Commissioner of Revenue, 460 U.S. 575, 103 S.Ct. 1365, 75 L.Ed.2d 295 (1983). Thus, I believe that no constitutional infirmity results from the fact that the sales tax now covers newspapers and other periodicals. However, the tax on advertising is different. Even though there are services rendered in the preparation and distribution of advertising, the advertising upon which the tax is laid is not a service as such. The advertising that is actually "sold or used in Florida" is in the nature of intangible personal property  the content of a printed advertisement or broadcast commercial. Thus, while purporting to tax advertising as just another service, the tax has a discriminatory effect because it is uniquely directed towards the dissemination of information. As such, it is a tax on speech itself. The more one speaks, the more one pays to the state. This represents *316 an impermissible burden on the right of free speech.[1]
I am also concerned that the way the law is drawn the tax is being imposed on the content of the advertising. In Arkansas Writers' Project, Inc. v. Ragland, ___ U.S. ___, 107 S.Ct. 1722, 95 L.Ed.2d 209 (1987), the United States Supreme Court struck down an Arkansas tax on the receipts from the sales of tangible personal property because it exempted certain items including newspapers and "religious, professional, trade and sports journals and/or publications printed and published within this State." Id. 107 S.Ct. at 1724-25. The Court reasoned that the tax discriminated between members of the press because it did not apply evenly to all magazines. The Court held that the tax was particularly repugnant to first amendment principles because in order to determine whether a particular publication came within its exemption, it was necessary to examine its contents.
Under the new Florida law, religious and charitable organizations are not required to pay the advertising tax. The state argues that when these organizations purchase advertising, they are exempt not because of the content of their speech but because of their status as exempt organizations. Yet, the unique character of such organizations necessarily involves the promulgation of particular messages. Moreover, the first amendment also prohibits the preference of one speaker over another. In First National Bank of Boston v. Bellotti, 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978), the Court said that the state is "constitutionally disqualified from dictating ... the speakers who may address a public issue." Id. at 784-85, 98 S.Ct. at 1420. While that Court has recognized the right of the state to provide tax relief for religious institutions, see Walz v. Tax Commission of New York, 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970), such preferences have not ordinarily involved subjects impinging upon the first amendment. It may be, of course, that even if the exemption provided for religious and charitable organizations is held invalid, only the exemption will be lost rather than the entire tax on advertising.[2]
While I cannot fault the motivation of the legislature in seeking to raise additional revenue through the taxing of advertising, I do not believe that that portion of chapter 87-6 is constitutional.
 Respectfully,
 Stephen H. Grimes
 Justice
The Honorable Bob Martinez
Governor of the State of Florida
The Capitol
Tallahassee, Florida 32301
Dear Governor Martinez:
You have asked the Justices of this Court, in essence, to advise you as to the constitutionality of Chapter 87-6, Laws of Florida. This is the first request for an advisory opinion since I have been a member of this Court, and it is with some unhappiness that for the reasons which follow, I must respectfully decline to render an opinion to your question.
The problems perceived by you growing out of this new legislation are not unique, except perhaps as to dimensions, and I can understand your desire to seek an expeditious answer. Unfortunately, in my judgment, you are asking for, at best, a placebo, to achieve a result that can only come from an adversarial proceeding between litigants in a court of law. Even though a majority of the Court has given you an opinion, you have not been given an ultimate answer. Surely as the night follows the day, all facets of your question will in due course, and hopefully with all deliberate speed, wend their weary way to this Court for final determination at the state level. At that time you will have your answer, and not just an advisory opinion, and the separation of powers between the *317 coordinate branches of government will have been respected.
I must say, without a great deal of pride, that the course this Court has followed with respect to similar requests for advice as to the constitutional validity vel non of a statute, has been checkered. Early on, in 1905, the Justices of this Court declined to respond to a request for advice from Governor M.B. Broward, stating:
Reduced to its last analysis, the purpose of your letter is not to have us construe any clause of the Constitution affecting your executive powers and duties, but to have us pass upon the constitutionality of an act of the Legislature
Section 13 of article 4 of the Constitution authorizes the justices of the Supreme Court, on the Governor's request, to interpret only some portion of the Constitution, and does not authorize the court, upon such request, to interpret or pass upon the constitutionality of statutes that affect the Governor's executive powers and duties. Advisory Opinion to Governor, 39 Fla. 397, 22 South. 681. For the reasons stated, we must respectfully decline to give any opinion upon the questions propounded.
Advisory Opinion to Governor, 50 Fla. 169, 39 So. 187 (Fla. 1905).
Again, the Justices declined to render an advisory opinion to Governor Collins determining the constitutionality of an act of the legislature. In re Advisory Opinion to the Governor, 113 So.2d 703 (Fla. 1959). This advisory opinion is best remembered for Justice Drew's plaintive confession for his past sins in participating in advisory opinions construing or passing upon the constitutionality of statutes when, writing separately, he said:
On several occasions since my appointment to this Court I have participated in advisory opinions to you and your predecessors in office which construed or passed upon the constitutionality of certain statutes of this State. It is now my view that, in rendering such opinion, I exceeded my authority as a Justice of this Court.
The Constitution plainly authorizes the Justices of this Court to advise you "as to the interpretation of any portion of [the Florida] Constitution upon any question affecting [your] executive powers and duties." From the adoption of the present Constitution until recent years the Justices of this Court have refused to advise the Governors of Florida as to their interpretation of or to pass upon the constitutionality of statutes of this State. It is my view that this Court should now return to that salutary principle epitomized in the conclusion of the Advisory Opinion to the Governor, 50 Fla. 169, 39 So. 187.
Id. at 706.
Before too many years had passed, the Justices answered a question from Governor Claude Kirk upholding the constitutionality of the 1970 general appropriation act. In re Advisory Opinion to the Governor, 239 So.2d 1 (Fla. 1970), Justice Drew, still a sitting Justice, remained true to his own counsel eleven years earlier. He refused to join with his brethern, citing his opinion In re Opinion to the Governor, 113 So.2d 703 (Fla. 1959), and wrote separately these concluding remarks:
The critical language of the Constitution of 1968 under which your request is presented is identical to the language of the Constitution of 1885 under which the request of Governor Collins was made. The provisions of the 1968 Constitution relating to procedure for obtaining advisory opinions does not-in my judgment-in any way enlarge the powers of this Court with respect to this basic constitutional question.
Looking back over more than a decade I can only conclude that the passage of time has confirmed the wisdom of this Court expressed by the majority in the advisory opinion above referred to, and my own views quoted above.
Consistency compels me therefore to respectfully decline to render any opinion upon the questions propounded.
239 So.2d at 12.
This Court's most recent incursion into this bramble and thicket occurred In re *318 Advisory Opinion to Governor, 374 So.2d 959 (Fla. 1979) with a sharply divided Court giving Governor Graham an opinion as to the constitutionality of a recently enacted statute. Justice Sundberg, writing separately, expressed my thoughts with his usual succinct eloquence:
Turning now to the reasons why I deem it inappropriate to render advice upon the constitutionality vel non of CS for SB 268. My reluctance to render such advice does not stem from a formalistic or technical posture, but from a real concern for the appropriate role to be exercised by the coordinate branches of government. The role of the judiciary in our form of government is unique in its accepted authority to declare acts of the coordinate branches invalid because they offend the terms or principles of our constitution. See Marbury v. Madison, 1 Cranch 137, 2 L.Ed. 60 (1803). This authority and responsibility to be the final arbiter of the constitutional validity of the acts of the legislative and executive branches is nothing less than awesome. While this Court should not, and does not, flinch from its obligation to exercise this power in an appropriate case, nevertheless, it is a power which should be exercised with circumspection.
A proper regard for the separation of powers among the branches of government indicates that the solemn responsibility of passing on the constitutional validity of legislative and executive acts should be exercised within the traditional adversary context, a mode which has proven to be superior for framing the issues and testing the truth of competing claims.
.....
I am not unmindful of the possible serious consequences of leaving unresolved an important question concerning the judicial structure of this state. I am more mindful, however, of the serious erosion to our system of separation of powers which I perceive will result from indiscriminately passing upon the constitutional validity of executive and legislative acts through the vehicle of an advisory opinion. Exigent circumstances always evoke the temptation to act, but it is in just such circumstances that we should be most careful to observe the principles of our constitution.
Id. at 971-72 (citations omitted, footnote omitted).
Article IV, section 1(c) of the Constitution of the State of Florida can be and is a very useful vehicle for the Chief Executive of this State to ask for counsel from the Justices as to the interpretation of any portion of the Constitution upon any question affecting his executive powers and duties. Properly used it respects the separation of powers between the executive and judiciary, and facilitates the expeditious handling of matters affecting the duties of the office of the governor. On the other hand, asking the Justices to pass on the constitutionality of a statute, in reality, resolves nothing because the advisory opinion has no precedential effect and is binding on no one and, finally, the odds are overwhelming that the parties ultimately concerned with the constitutionality of that bit of legislation will properly resort to the courts for judicial determination of that question. Of course, my fundamental objection to the procedure utilized by you is answered by Justice Sundberg on the question of the separation of powers doctrine as quoted above.
I certainly cannot fault Your Excellency for requesting an advisory opinion, considering the lack of any clear direction from the Justices in this area and particularly the most recent responses from the Justices to your predecessors in office. By the same token, I assure you that in declining to respond to your request I am motivated solely by what I perceive to be my duties and responsibilities as a Justice of this Court.
 Sincerely,
 Raymond Ehrlich
 Justice
The Honorable Bob Martinez
Governor of the State of Florida
The Capitol
Tallahassee, Florida 32301
*319 Dear Governor Martinez:
Although your request for an advisory opinion was put forth in some detail, it essentially asks only a single question: Is Chapter 87-6, Laws of Florida (1987), constitutional? For the reasons that follow, I must respectfully decline to offer an opinion on this question.
My reluctance to advise you in this matter rests on two grounds. First, I believe that acceding to your request in this context would further erode the separation of powers, which is basic to our system of government; and second, I find that an advisory opinion cannot and will not assist in resolving, with any meaningful finality, the broader questions implicit in the concept of "constitutionality." The true test of this statute will come, not in any non-binding advisory opinion, but in the scores of fact-specific controversies already being brought to this state's courts and to the federal courts.
Using the advisory power to judge the constitutionality of newly enacted legislation necessarily injects the judiciary into a role for which it is ill-suited. Under the majority's analysis, the justices of this Court may advise the governor concerning the validity of any statute, without limitation, because every statute potentially affects the governor's duty to faithfully execute the laws. Yet this is the antithesis of the judicial function. Traditionally the judiciary decides specific issues arising from specific facts. However, a non-binding advisory opinion upon the facial constitutionality of a newly enacted statute decides virtually nothing. Moreover, to review comprehensive and complex legislation, albeit one dimensionally, in such a broad and unfocused manner does not serve any appropriate interest. I do not believe the advisory power conferred by article IV, section 1(c), anticipates this kind of review.
Indeed, practical concerns, time-honored policies and constitutional principles all dictate that the validity of new enactments should be resolved only in the context of particular factual disputes. As Justice Sundberg stated when he declined to answer a question posed by Governor Bob Graham:
A proper regard for the separation of powers among the branches of government indicates that the solemn responsibility of passing on the constitutional validity of legislative and executive acts should be exercised within the traditional adversary context, a mode which has proven to be superior for framing the issues and testing the truth of competing claims.
In re Advisory Opinion to the Governor, 374 So.2d 959, 971 (Fla. 1979) (Sundberg, J., writing separately).
The wisdom underlying Justice Sundberg's analysis and the inability of an advisory opinion to resolve with any finality the questions you raise is amply illustrated by the majority's necessarily limited response.
The majority recognizes that it cannot, and does not, pass on federal constitutional questions. Yet in confronting freespeech issues, for instance, the majority relies almost entirely on its interpretation of federal case law, even though its inquiry is limited to state constitutional issues. This analysis, while it may seem to resolve a federal question, is not binding upon the federal courts and thus does not resolve the issues. Nor can the majority properly consider the troubling constitutional issues raised by the fact that, under chapter 87-6, the State of Florida will have a direct economic interest in convicting defendants. These federal issues necessarily will be left for another court to decide.
Most importantly, the majority opinion necessarily is limited only to facial constitutionality because no factual issues are before us. This is particularly important, in my view, since most issues that have been raised by the parties really deal with the question of the constitutionality of the enactment as it eventually may be applied.
I agree with Justice Sundberg when he wrote that

*320 [t]he role of the judiciary in our form of government is unique in its accepted authority to declare acts of the coordinate branches invalid because they offend the terms or principles of our constitution. This authority and responsibility to be the final arbiter of the constitutional validity of the acts of the legislative and executive branches is nothing less than awesome. While this Court should not, and does not, flinch from its obligation to exercise this power in an appropriate case, nevertheless, it is a power which should be exercised with circumspection.
Id. (citation omitted, footnote omitted).
 Respectfully,
 Rosemary Barkett
 Justice
NOTES
[1] We recognize that the legislature has now enacted chs. 87-72 & 87-101, Laws of Fla., amending ch. 87-6, Laws of Fla. Because only the first of these so-called "glitch bills" had been signed into law at the time of oral argument, we have not considered ch. 87-101 within the text of this advisory opinion.
[2] This finding prevents us from addressing your concerns regarding questions arising under the supremacy clause of art. VI, the due process and equal protection clauses of the fourteenth amendment, the provisions of art. III relating to the judicial power of the federal courts, the commerce clause of art. I, and the provisions contained within the 1st, 5th, 6th, and 8th amendments to the United States Constitution. We point out, however, that, with the exception of the supremacy clause and the commerce clause, Florida's Constitution contains provisions similar to each of the above.
[3] No tax is levied on legal services that are provided without charge. Therefore, legal services provided to indigents or those who cannot afford to pay their attorneys are not taxed. Ch. 87-6, § 7, Laws of Fla. (amending § 212.02(21), Fla. Stat.) Likewise, because nonprofit entities and governments pay no taxes on any goods or services, they pay no tax on their purchase of legal services. Ch. 87-6, § 14, Laws of Fla. (amending § 212.08(6) & (7), Fla. Stat.). Additionally, because no employee wages or salaries in any business are taxed, ch. 87-6, § 3, Laws of Fla. (amending § 212.0592(2), Fla. Stat.), exempts from taxation legal services provided to employers by their employees. Other exceptions apply to legal services as well.
[4] See supra note 3.
[5] The act's reference to the Standard Industrial Classifications Manual (SIC) refers to the 1972 edition as published by the Office of Management and Budget, Executive Office of the President, and as amended in the 1977 supplement. Ch. 87-6, § 7, Laws of Fla. (creating § 212.02(24), Fla. Stat.).
[6] We also note that representatives of the broadcasting industry argue that certain provisions of ch. 87-6 are so vague that they fail to satisfy the fair notice requirements of due process. Our resolution of the vagueness issue in the context of separation of powers renders a discussion of this due process contention unnecessary.
[7] For a more detailed discussion of the nature of the sales and use tax on services, please see our discussion set forth under part IV, which deals with whether ch. 87-6 creates an income tax.
[8] Grosjean, 297 U.S. at 251, 56 S.Ct. at 449. As the Supreme Court later explained in Minneapolis Star, 460 U.S. at 579-80, 103 S.Ct. at 1368-69, the Court had attached significance to the Louisiana legislature's motivations in Grosjean. In that case, the tax had been imposed largely in an attempt to silence certain selected newspapers that had been critical of Senator Huey Long.
[9] Ink and paper used in publications were the only components of goods to be sold at retail that were taxed and the law exempted the first $100,000 worth of ink and paper used in any given calendar year. 460 U.S. at 578, 103 S.Ct. at 1368.
[10] For example, prior to the enactment of ch. 87-6, Laws of Fla., food ads printed in a newspaper were exempt from taxation while food ad inserts in newspapers were taxed. See Fla. Admin. Code Rule 12A-1.34 (1982). Likewise, political bumper stickers, leaflets, and brochures were taxed while political advertisements broadcast on television and radio were exempt. See § 212.08(7)(d)2, Fla. Stat. (1985).
[11] Opponents of the act also argue that the instant act violates art. I, § 4 of the Florida Constitution by containing unconstitutionally vague terminology and by failing to further the state's goal of increasing revenues. Our determination of the vagueness issue in our upcoming discussion of the separation of powers doctrine makes a discussion of vagueness unnecessary here. As for the amount of revenue the act will eventually raise or the regressive effect it may have on Florida's economy, those questions go to the wisdom of the act, upon which we will not second guess the legislature. E.g., Holley v. Adams, 238 So.2d 401 (Fla. 1970); Twomey v. Clausohm, 234 So.2d 338 (Fla. 1970). We find the taxation of advertising revenues rationally related to the goal of raising revenue and our analysis must end upon such a determination.
[12] The industry argues that the tax created double taxation by:

(1) requiring prime contractors to pay sales taxes on the amount included within the price charged by the subcontractor, which may include goods, equipment, or services, upon which a sales tax has already been paid; (2) treating the prime contractor as the ultimate user of material, equipment, and supplies purchased for his own use on the project, but which are not incorporated into the project itself; and (3) by constituting a second income tax in addition to the corporate income tax which the prime contractor already pays.
[13] Newly created § 212.0594(6) requires the prime contractor to pay a tax on purchases from subcontractors that are not exempt under certain listed criteria contained therein. Ch. 87-6, § 5, Laws of Fla. § 212.0594(8) requires the prime contractor to pay a tax on new construction services based on the cost price of the construction. This tax is due either when the construction contract is fulfilled or when the certificate of occupancy is issued, whichever occurs first. Ch. 87-6, § 5, Laws of Fla.
[14] Although potential taxpayers have challenged on vagueness grounds the definition of such terms as "other than print or broadcast media," "use," and "fair," we do not find such terms so unreasonably vague on their face as to justify invalidating the act. We do not believe that every such term used in the law must be statutorily defined.
[15] Newly created § 212.0594 provides in pertinent part:

Construction services; special provisions.  Notwithstanding other provisions of this part to the contrary:
... .
(6) The tax on purchases of construction services by prime contractors shall be based on the total consideration paid to the subcontractor. However, if the written proposal, contract, or interim or final invoice of the subcontractor specifically describes, itemizes and states the price paid by the subcontractor for the building materials purchased by the subcontractor and incorporated into the improvement in fulfillment of his responsibilities under the subcontract, the tax shall be based on the total consideration less the price of said building materials.
... .
(8) There is hereby imposed a tax on the construction services any prime contractor provides with respect to new construction for himself or others. The tax shall be based upon the cost price to the prime contractor of the services he provides, without any deduction therefrom on account of the cost of materials or supplies used, labor costs, service costs, or transportation charges notwithstanding the provisions of s. 212.02 defining "cost price." However, the cost of building materials purchased by the prime contractor and incorporated into the new construction, and amounts paid to subcontractors upon which a sales tax has been paid, shall not be included in the cost price. The tax shall be due and payable as otherwise provided in this part at the time the contract for new construction is fulfilled or within 30 days after the certificate of occupancy is issued, whichever is sooner. The retail sale of new construction for which the prime contractor has paid tax pursuant to this subsection shall be exempt from the tax imposed by this section.
Ch. 87-6, § 5, Laws of Fla.
[1] The Court in Baltimore v. A.S. Abell Co., 218 Md. 273, 145 A.2d 111 (App. 1958), held a similar tax on advertisizing unconstitutional on first amendment grounds.
[2] The new law contains a provision that if any exemption is declared facially unconstitutional, the legislature intends that the exemption be deemed inoperative. Ch. 87-72, § 2, Laws of Fla.