MAYOR AND CITY COUNCIL OF BALTIMORE ET AL. *v.* A. S. ABELL COMPANY ET AL.

[No. 123, September Term, 1958.]

(Seventeen Appeals In One Record)

*Decided October 17, 1958.*

*Motion for rehearing filed November 13, 1958, denied November 20, 1958.*

The cause was argued before HENDERSON, HAMMOND,

PRESCOTT and HORNEY, JJ. and NILES, Chief Judge of the Supreme Bench of Baltimore City, specially assigned.

*Hugo A. Ricciuti, Deputy City Solicitor of Baltimore,* and *Carl H. Lehmann, Jr., Assistant City Solicitor,* with whom were *Thomas N. Biddison, City Solicitor, William H. Marshall, Assistant City Solicitor,* and *Aaron A. Baer, Assistant City Solicitor,* on the brief for appellants.

*William L. Marbury,* with whom were *Franklin G. Allen* and *Piper & Marbury* on the brief, for Associated Dry Goods Corporation, and fifteen other retail merchants, appellees.

*William L. Marbury,* with whom were *Charles C. G. Evans, Franklin G. Allen* and *Piper & Marbury* on the brief, for The Baltimore Radio Show, Inc., and The Baltimore Broadcasting Company, appellees.

*Richard F. Cleveland,* with whom were *James P. Garland* and *Semmes, Bowen & Semmes* on the brief, for A. S. Abell Company, appellee.

*Joseph Sherbow,* with whom were *Edward F. Shea, Jr.,* and *Sherbow & Sherbow* on the brief, for Baltimore News-American Division of Hearst Consolidated Publications, Inc., and WBAL Division of the Hearst Corporation, appellees.

*Harrison L. Winter,* with whom was *Theodore C. Waters* on the brief, for Westinghouse Broadcasting Company, Inc. (Maryland), appellee.

*Frank B. Ober* and *Alexander Harvey, II,* with whom were *Thomas W. Jamison, III,* and *Ober, Williams, Grimes & Stinson* on the briefs, for C. H. Musselman Company, Pepsinic Seltzer Corporation and Donnelly Advertising Corporation, appellees.

*William Bruce Oswald,* with whom was *J. Purdon Wright* on the brief, for The Baltimore Broadcasting Corporation (WCBM), appellee.

*Nelson B. Lasson* for H. Milton Lasson and Nelson B. Lasson, appellees.

*Harrison L. Winter,* with whom was *Clyde Y. Morris* on the brief, for Plough Broadcasting Company, Inc., appellee.

Submitted on brief by *Charles Mindel* and *Buckmaster, White, Mindel & Clarke* for Sadie Alter and Geraldine Buerger, co-partners trading as "The Jewish Times", appellee, and by *Harry O. Levin* and *Marshall A. Levin* for The Afro American Company, appellee.

No brief and no appearance for The Key Broadcasting Company, Belvedere Broadcasting Corporation and Thirteen-Sixty Broadcasting Co., Inc., appellees.

PRESCOTT, J., delivered the opinion of the Court.

These appeals involve the validity *vel non* of Ordinances 1097 and 1098 approved by the Mayor and City Council of Baltimore on November 15, 1957. At the conclusion of the trial below, a final order was passed which declared that both ordinances were unconstitutional and void except insofar as they provided for a refund of the taxes paid thereunder, and enjoined the Mayor and City Council of Baltimore and the City Treasurer from enforcing the provisions of said ordinances except insofar as they provided for a refund of the taxes already paid. From this order, the City and the City Treasurer have appealed.

Ordinance No. 1097 levied and imposed, upon the purchasers, a tax at the rate of 4% upon the gross sales price, if used for or in connection with advertising or advertising purposes, of the following: every sale of space in all newspapers, magazines, periodicals, programs, directories and other printed matter published in Baltimore; in, on or upon or attached to any vehicle or airbourne device by any person whose principal operations are in the City of Baltimore; each and every sale of time on, or in connection with, any intrastate radio or television broadcast originating in the City of Baltimore and directed to persons in the State of Maryland or any part thereof. The ordinance then provided for certain exemptions, the manner of collecting the tax and other matters with which we are not immediately concerned.

Ordinance No. 1098 levied and imposed, upon the sellers

of the same space and time named in Ordinance 1097, a 2% gross receipts tax.

Both of the ordinances in question have been repealed, effective December 31, 1958; so the taxes in question involve only impositions for the calendar year 1958.

The appellees may be divided into four general classifications: (1) newspaper publishers; (2) radio and television broadcasters; (3) bill-board operators; and (4) the purchasers of advertising, both out-of-state and local. They were the complainants below, and all of their cases having been consolidated resulted in the final order mentioned above.

The evidence discloses that in the fall of 1957 the Mayor and City Council of Baltimore met to consider the budget for the fiscal year 1958. Ordinance No. 1097 as originally introduced provided for a 7½% tax upon the gross sales of advertising space and time. As finally passed and approved, it imposed a tax of 4% upon the gross sales price of every sale of space for advertising as noted above; and Ordinance 1098 imposed an additional 2% on the gross receipts from the sale of advertising space and time. The Budget Director of Baltimore City estimated that these taxes combined would produce the sum of $2,653,000 for the year 1958.

On January 28, 1958, the City Treasurer, charged with the enforcement of the ordinances and the collection of the taxes thereunder, issued a regulation prepared by his legal adviser, the City Solicitor of Baltimore. This regulation, apparently based on the interstate character of most radio and television broadcasting, had the effect of exempting the major portion of such business from the two taxes.

Pursuant to the ordinances and the regulations promulgated thereunder, the various advertisers and media filed their reports and paid the taxes. The three television stations in Baltimore City, which are also complainants in the case, collected gross receipts for the first three months of 1958 totaling $1,636,701.44. However, the total tax paid by their advertisers at the rate of 4% on sales was only $5,005.27. The reason for this great disparity between gross receipts and taxes paid lies in the fact that exempt sales amounted to $1,560,772.66, thus leaving taxable sales of only $75,928.78.

The gross receipts of the radio stations for this period were $733,001.49, with exempt sales of $499,933.64, leaving taxable sales of $224,110.01. The taxes paid by the advertisers on radio stations at the rate of 4% of the gross sales subject to the tax were $11,298.51.

With respect to the newspapers, however, the picture is strikingly different. Their gross receipts for the same three-month period were $5,985,784.85 and their taxable sales were $5,393,442.13, their exempt sales being only $630,309.41. The taxes paid at the rate of 4% on these sales were $216,243.58.

Under Ordinance 1098, which imposed the 2% gross receipts tax, the newspapers, for the same period paid $114,334.12, the radio stations $5,423.99 and the television stations $2,502.62.

In paying these taxes, the Bureau of Receipts of Baltimore City computed that with reference to the 4% sales tax the radio and television stations had 26.5% of the gross receipts of the media whose advertising was subject to said tax, but paid only 6.5% of the actual tax paid. The newspapers received only 66.9% of the gross receipts, but their advertising was required to pay 86.2% of the tax paid.

The gross receipts tax of 2% discloses a similar situation according to the Bureau of Receipts. The radio and television stations received 27.7% of the gross receipts of the advertising of the media subject to the tax, but paid only 6.1% of the tax paid, while the newspapers paid 88.6% of the tax, but received only 66.1% of the gross receipts.

The newspapers offered evidence to show they paid all of the ordinary and usual taxes to the Federal government, the State of Maryland and to the City of Baltimore.

An illustration of the impact of the advertising tax is shown by the following facts: On the 2% gross receipts received by the Sunpapers, they paid in the first quarter of 1958 the sum of $78,646. Since the average Baltimore newspaper experience is that the first quarter represents 22½% of the entire year, this would indicate a total payment for 1958 of $349,541. Assuming that the ordinary City taxes will remain the same in 1958, the Sunpapers' total City tax

bill will soar from $212,734 paid in 1957 to $562,602 in 1958. (This includes the negligible tax of $326.76 paid by WMAR-TV, owned by the same company, virtually all of whose revenues are exempt from taxation under the regulations.) Therefore, this one concern would pay an increase in City taxes of $349,868 attributable to this one tax, alone. This is vastly greater than the entire 1957 total of all of its ordinary taxes paid to the City and State. Comparable percentages and figures are applicable to the Baltimore News-Post and Sunday American.

An exhibit offered by the appellees discloses that based upon the 1957 advertising dollar volume, 41.47% of the advertising done in the Baltimore Metropolitan Area is not taxed by the ordinances. The excluded items are such as direct mail advertising, point-of-purchase advertising and advertising in consumer magazines. At this same time, the newspapers alone carried 39.23% of the total volume of advertising.

The appellees assert that these taxes injured the advertising media as well as the advertiser. Newspaper advertising linage in Baltimore in the first four months of 1958 compared with 1957 has fallen off 12%, which is nearly twice as much as in Philadelphia (6.3%), Pittsburgh (6.7%), or Washington (6.3%), while the national average of decline in 52 cities in that period has been 7.8%, compared to a loss of 12% for Baltimore. The appellees claim this additional Baltimore loss was due to these taxes.

An analysis of the above facts possibly indicates discrimination in a constitutional sense against the newspapers, but they have been stated primarily to disclose the nature of the taxes imposed and where their real impact falls.

It should be noted that the appellees do not claim, nor does the record disclose, any ulterior, malevolent or untoward motive against any of the advertising media in the passage of said ordinances.

We think that both ordinances may be considered together. There is no doubt that radio and television stations (sometimes herein referred to as "the stations") are included within the constitutional guarantees of freedom of speech and of

the press. *American Broadcasting Co. v. United States,* 110 F. Supp. 374, 389; *United States v. Paramount Pictures,* 334 U. S. 131, 166; *Trinity Methodist Church, South v. Federal Radio Commission,* 62 F. 2d 850 (App. D.C.); 11 *Socolow, The Law of Radio Broadcasting,* sec. 562 p. 109 and footnotes. Cf. 47 U. S. C. A., sec. 326 (1934), and *Baltimore Radio Show, Inc. v. State,* 193 Md. 300, 323, 67 A. 2d 497. The 2% gross receipt tax is, of course, a direct tax on the advertising media, and there can be no doubt that the newspapers and the stations may contest its constitutionality. The purchasers of advertising assert no claim that they are entitled to contest the validity of this tax. The 4% sales tax is, in form, a tax on the purchasers of advertising, but the evidence establishes the fact that its practical effect is, to all intents and purposes, virtually the same as the gross receipts tax. In the early case of *Osborn v. Bank of United States,* 22 U. S. (9 Wheat.) 738 (1824), a tax imposed on the Bank by the State of Ohio was held unconstitutional as an infringement of the immunity of the Federal Government. The State defended the tax on the ground that it was not upon a branch of the Government itself, but that the Bank was to be likened to a contractor with the Government, and, therefore, it could not partake of the Government's immunity. Chief Justice Marshall stated (at page 867) that if it were true that the connection of the Bank with the Government bore a more perfect resemblance to contractors, it would put the question on no different footing, for the tax would act as a control of the Government's functions in the same manner whether laid upon the Government directly, or whether it singled out for special taxation the agency through which the Government acted. In *Alabama v. King & Boozer,* 314 U. S. 1, a sales tax on a sale of lumber to a contractor for use in performing a cost-plus contract with the Government was held valid because the tax was of broad coverage without discrimination against Government contractors. In *James v. Dravo Contracting Co.,* 302 U. S. 134, a state gross-receipts tax was held valid as applied to the receipts of an independent contractor from the performance of a Government contract on the same ground, that the indirect burden that it put upon the Government was incidental to a

general coverage. But neither opinion leaves any doubt that a tax specifically seeking out the revenues gained by contractors from public work would be invalid as violating sovereign immunity even though they had their immediate incidence upon a private person. Cf. *Railroad Company v. Peniston,* 85 U. S. (18 Wall.) 5, 36.

The opinion of Justice Holmes in *Miller v. Milwaukee,* 272 U. S. 713, makes it quite clear that the test in such a case as this is whether a special burden is being put upon a protected activity and not who happens to be the one who pays the tax. Wisconsin taxed the income of corporations except for their constitutionally exempt income received from United States Bonds. It did not ordinarily tax stockholders on dividends, but an act was passed taxing stockholders on dividends to the extent that they represented income not taxed to the corporation. Thus, although the state was merely taxing dividends to stockholders, it was indirectly achieving the same result as though the tax were laid upon corporate income received from Government bonds. Justice Holmes stated for a unanimous court that the test was not the legal incidence of the tax but its indirect burden, and, since it amounted to a special tax upon dividends traceable to interest on Government bonds, other dividends being exempt, the tax was invalid. See also the very persuasive case of *Station WBT v. Poulnot,* 46 F. 2d 671 (E.D.S.C.) and the cases cited therein. There, the Court struck down, as unconstitutional, an annual license tax imposed on radio receiving sets by the State of South Carolina, at the suit of a broadcasting station. Although the broadcasting station did not pay the tax itself, it was held to have a standing to bring the suit by reason of the threat to its broadcasting business. We, therefore, arrive at the conclusion that both of the taxes involved in our present case may be considered together, and the question of the unconstitutionality of the 4% sales tax on advertising—if a restraint upon the freedom of the press or of speech has been shown—is available to the purchasers of advertising as well as the newspapers and the stations.

The appellants apparently do not contest this ruling, i. e., if the 4% sales tax be, in fact, a restraint upon the consti-

tutional immunities of free speech or free press of the newspapers and the stations, that such restraint may be invoked on behalf of the purchasers of advertising as well as the newspapers and the stations; but they earnestly assert, as we shall hereafter see, that the tax is not a restriction of either freedom of speech or of the press.

The appellees raise many contentions as to why the ordinances are invalid and unconstitutional; but, in the view that we take of the case, we shall first consider the contention made by all of the appellees, namely, that the ordinances constitute an abridgement of the freedoms of speech and of the press as guaranteed by the First and Fourteenth Amendments to the Constitution of the United States and Article Forty of the Declaration of Rights of Maryland. We shall first consider this contention as it applies to the newspapers, radio and television broadcasts and the local purchasers of advertising.

The appellees contend that these taxes are special, extraordinary and unique as distinguished from ordinary or general taxes that affect all, or a broad segment of, businesses alike; and, as such, their imposition violates the constitutional protection of the freedoms of speech and of the press. They make no claim that the press or the stations are immune from contributing to the expenses of the government, but candidly concede that they are subject to the payment of all ordinary and general taxes, and offered proof that the newspapers and the stations have paid all of the usual Federal, State and City taxes.

The basic argument of the appellants is that the taxes are on the business activity of buying and selling advertising space and time, and while they may not reach all advertising, they are broad enough in their nature and character so as to escape the designation of being "single in kind" and therefore do not violate the immunities of freedom of speech or of the press.

The issue involves one of those fundamental principles of liberty and justice which lie at the base of all of our civil and political institutions. The First Amendment to the Constitution of the United States provides: "Congress shall make no law respecting an establishment of religion, * * *; or

abridging the freedom of speech, or of the press; * * *." Through the medium of the Fourteenth Amendment, the States as well as Congress are proscribed from enacting any such laws. *Near v. Minnesota,* 283 U. S. 697, 707. Article 40 of the Maryland Declaration of Rights states that the liberty of the press ought to be inviolably preserved; that every citizen of the State ought to be allowed to speak, write and publish his sentiments on all subjects, being responsible for the abuse of that privilege.

The celebrated case of *Grosjean v. American Press Co.,* 297 U. S. 233, involved a license tax for the privilege of engaging in the business of selling, or making any charge for, advertising or for advertisements in periodicals or publications having circulations of more than 20,000 copies per week. The amount of the tax was 2% of the gross receipts of "such business." The late Huey Long had apparently centralized the executive and legislative powers of the State of Louisiana in his own hands. The larger newspapers were opposed to his *modus operandi* and did not hesitate to publish their sentiments, while the smaller periodicals were, in general, sympathetic to his cause. One of his reputed statements is to this effect: "For each dollar these papers (the larger ones) take in, they tell a lie. There is no reason why the State of Louisiana should not receive two cents for each of these lies." It was claimed that the tax was a punitive imposition on the larger newspapers because of their opposition to him, and the validity of the act imposing the tax was stoutly opposed as (1) abridging the freedom of the press, and (2) denying the larger newspapers the equal protection of the laws to which they were entitled.

The Supreme Court, in agreeing with the position of the newspapers, decided the case on the first point alone. Justice Sutherland, for the Court, pointed out that the question involved was of the utmost gravity and importance, going "to the heart of the natural right of the members of an organized society * * * to impart and acquire information about their common interests." He then stated that a determination of the question required an examination of the history and circumstances which antedated and attended the adoption of the

abridgment clause of the First Amendment. That history discloses a persistent effort for many years on the part of the British government to prevent or abridge any expression of opinion that criticized the agencies and operation of the government. At an early date (probably about 1640), Parliament passed an act providing for the *censorship* of the press prior to publication. This act was strongly and persistently opposed. Justice Sutherland says it expired by its own terms in 1695, and was not renewed. However, in 1712 Parliament imposed a *tax* upon all newspapers and upon advertisements. The Supreme Court states (at page 246): "That the main purpose of these taxes was to suppress the publication of comments and criticisms objectionable to the Crown does not admit of doubt." The opinion then points out that these taxes —commonly called taxes on knowledge—were resisted and evaded for more than a century, and they constituted one of the important factors that aroused the American colonists to protest against taxation for the purposes of the home government.[1]

The opinion then points out that in 1785, only four years before the First Amendment was proposed, the State of Massachusetts imposed a stamp tax on all newspapers and magazines and a tax on advertisements, and both of the taxes met with such violent opposition that they were repealed very shortly after enactment.

This rather elaborate background was given in order to arrive at the true meaning of the words "freedom of the press" as used in the First Amendment. It was held that such freedom did not consist only in immunity from previous *censorship,* but was broader in its scope; that the First Amendment was intended to preclude the national government and the Fourteenth Amendment to inhibit the states, "from adopting *any* form of *previous restraint* upon printed publications, or

---

1. For other interesting and more detailed accounts of the censorship of, and taxes upon, the press and the resistance thereto, see 6 Holdsworth, *A History of the English Law,* beginning at page 360, and 3 *Select Essays in Anglo-American Legal History,* beginning at page 462. See also I Scharf, *History of Maryland,* pp. 524 ff.; *Charles Carroll of Carrollton,* p. 74.

their circulation, including that which had theretofore been effected by these two (the stamp and advertising taxes) well-known and odious methods."[2] (Emphasis added.) The Court determined the tax involved operated as a "restraint in a double sense": that its effect was to *curtail the amount of revenue from advertising,* and it had a direct tendency to restrict circulation. The act was therefore found to be unconstitutional and void. The Court, however, was careful to call attention to the fact that it did not intend to suggest that newspapers were immune from any of the ordinary forms of taxation for support of the government, but stated that the tax they were considering was "single in kind" with a long history of hostile misuse against the press. We have set forth this case at considerable length, because we believe that fundamentally, it is controlling in the case at bar.

The appellants insist that the ordinances do not infringe the constitutional guarantees of freedom of speech and of the press. They assert that the *Grosjean* case, *supra,* is not decisive of the result to be reached in this case; that the Court there pointed out that the newspapers were not immune from general taxation; that the background of that case displayed a punitive motive of an unquestioned political power in imposing a 2% gross receipts tax on the advertising of publications having a circulation of more than 20,000 copies per week; that in the case at bar there is admittedly no ulterior motive behind the enactment of the ordinances; that the tax in *Grosjean* was struck down because it was a deliberate device to limit the circulation of information; and that the decision in *Grosjean* is entirely consistent with the view that an ordinary gross receipts tax may be imposed on the press, and, by logical extension, an ordinary sales tax, measured by the gross sales price of the advertisement may be imposed upon advertisers. They contend that any doubts which might have arisen were completely dispelled by subsequent cases in which the Supreme Court upheld such taxes or, in effect, upheld them by dismissing on the ground that no substantial

---

**2.** See also *Howard Sports Daily v. Public Service Commission,* 179 Md. 355, 361, 18 A. 2d 210, where this Court used practically the same language.

constitutional questions were involved, and cite the following cases: *Giragi v. Moore,* 64 P. 2d 819 (Ariz.), *cert. den.* 301 U. S. 670; *Arizona Pub. Co. v. O'Neil,* 22 F. Supp. 117 (D. Ariz.), *aff'd* 304 U. S. 543; *Tampa Times Co. v. City of Tampa,* 29 So. 2d 368 (Fla.), *app'ls. dism.* 332 U. S. 749; *City of Corona v. Corona Daily Independent,* 252 P. 2d 56 (Cal.), *cert. den.* 346 U. S. 833; and *Oklahoma Press Pub. Co. v. Walling,* 327 U. S. 186, 194.

All of this argument is predicated upon, and assumes, the fact that the taxes involved herein are *ordinary* or *general* in their nature and operation, as distinguished from special or *"single in kind"* taxes. This is so because, in general, if a valid tax be imposed on businesses that do not enjoy any constitutional immunity, the effect of the impact and the oppressiveness of the tax are matters for the legislative conscience to consider; but, when the tax is imposed upon a business that enjoys one of the constitutional immunities of the First Amendment, it must be general in its nature and character and affect this business only incidentally as it affects other businesses in their combined duty to support the government. We have stated that the Supreme Court has held, and the appellees admit, that they are required to pay all ordinary and general taxes for the support of government. But, can the proposition that these taxes are ordinary or general taxes be sustained? We think not. They are imposed upon a segment of the advertising industry, and, in practical effect, have approximately 90% to 95% of their impact upon newspapers and radio and television stations, businesses entitled to immunities of the First Amendment. The taxes reach no business other than a portion of those engaged in advertising. There are over 100,000 taxing subdivisions in the United States. Although there is a constant and penetrating search for new sources of revenue, we were referred to, and have found, no tax on advertising alone. Upon the record, as now presented to us, it is not necessary to determine whether a tax upon the whole advertising industry (some 41% thereof being excluded from the operation of the ordinances) would be valid or not; nor is it necessary to delineate the exact boundaries of what constitutes an ordinary

or a general tax. The root of the evil in these ordinances lies not merely in the fact that they curtail the dollars received by the newspapers and the stations, but in the fact that being entitled to the advantages granted by the First Amendment, they are singled out and required to pay a special tax that is not required of business in general or some broad portion thereof. The judges are compelled to pay income taxes as other citizens are, but, if the judges' salaries were singled out and they, alone, were required to pay such taxes, there would be few who would try to champion the same as a valid enactment of law;[3] or, if the churches, carrying a constitutional immunity, were required to pay a real estate tax, when no such tax was imposed on others, the invalidity of such a tax would not admit of doubt.

The appellants take violent issue with the court below in its finding that the effect of the 4% sales tax was, at least, practically the same as the gross receipts tax; that the media, in order to get one dollar for a given amount of space or time, must induce the advertiser to pay a dollar and six cents, four cents of which the advertiser pays as tax and two cents of which the media pay as tax; and that the newspapers pointed out that they cannot pass on this tax, and, inevitably, it either will reduce their profits, they will have no profits or they must raise the rates. We think the evidence justified the above finding by the trial court, and the further finding, not contested by the appellants, that the newspapers derive 75% of their income from advertising.

We do not hold that every tax imposed upon the newspapers or the stations, or the producers of revenue to the newspapers and the stations, that may incidentally affect the power of such media to collect and disseminate news because of reduced revenue is violative of the freedoms guaranteed by the First Amendment; but we do hold that these particular taxes are so single in their nature and the range of their impact is so narrow—90% to 95% thereof falling upon the newspapers and the stations—that their effect makes them constitute a restraint upon the freedoms of speech and of the

---

3. Cf. *O'Malley v. Woodrough,* 307 U. S. 277.

press guaranteed by the First and Fourteenth Amendments to the Federal Constitution and Article 40 of the Maryland Declaration of Rights, as defined by the *Grosjean* and *Howard Sports Daily* cases, *supra.*

We are unable to accept the argument that the question of ulterior motive in the enactment of the law was, alone, controlling in the *Grosjean* case. A tax may be just as serious a restraint upon an immunity if enacted by a legislative body actuated by the purest of motives as one initiated and motivated by a hostile political leader. The Court specifically rested its opinion on a violation of the immunities guaranteed by the First Amendment; and in the recent case of *National Association for the Advancement of Colored People v. Alabama,* 357 U. S. 449, 78 S. Ct. 1163, 1171, the Supreme Court stated, "In the domain of these indispensable liberties, whether of speech, press or association, the decisions of this Court recognize that abridgement of such rights, *even though unintended,* may inevitably follow from varied forms of governmental action." (Emphasis added.)

A reading of the cases cited by the appellant on the point under consideration and set forth above discloses merely a reaffirmation of the statements made in *Grosjean* that newspapers and periodicals are not immune from ordinary and general taxes that apply to all business, or a broad segment thereof, alike; and the *Oklahoma Press Publishing Co.* case decided that newspapers were not exempt from the provisions of the Fair Labor Standards Act by reason of the First Amendment.

This leaves for our determination the causes of the billboard operators and the out-of-state or "foreign" purchasers of advertising. If we assume, without deciding, that the ordinances, insofar as they apply to these appellees would be constitutional and valid enactments of law if they stood alone, we are unable to conclude that the Mayor and City Council would have adopted the ordinances if they had known the ordinances could only be effectual as to these appellees. *State v. C. & P. R. R. Co.,* 40 Md. 22, 49; *Foote v. Clagett,* 116 Md. 228, 241, 81 A. 511; *Rawlings v. Russell,* 165 Md. 261, 265, 167 A. 186; *Tax Comm. v. Balto. Nat. Bank,* 174 Md. 403, 417, 199 A. 119.

It is true that the ordinances involved herein contained saving clauses; but this Court stated in *Cromwell v. Jackson,* 188 Md. 8, 28, 29, 52 A. 2d 79:

> "In the light of the prior decisions of this Court we hold that some of the duties imposed on the judges of the Circuit Court for Allegany County by Section 305 are quasi-legislative and hence non-judicial, and that the Act as a whole is unconstitutional and invalid, despite the severability clause. *Maryland Theatrical Corp. v. Brenman,* 180 Md. 377, 386, 24 A. 2d 911, 916. It was said in that' case: 'It is sometimes possible for a court to strike down portions of an act and to uphold the remainder. It is never done, however, where the part of the act remaining after the invalid portions are removed, clearly presents a situation which could not have been intended by the legislature.' "

And .this is the general law, elsewhere, as adjudicated by the highest judicial authority throughout this country, and as enunciated by eminent text-writers upon the subject. In the absence of a severability clause, a presumption is raised that the legislature intends the act to be effective as an entirety. If there be a saving clause, .an opposite presumption of separability is raised, 11 *Amer. Jur., Constitutional Law,* sec. 156, p. 847, 2 Sutherland, *Statutory Construction,* sec. 2409; but the saving clause is not absolute or an inexorable command, for it is merely an aid to interpretation. It must be afforded a reasonable interpretation, but does not operate to save provisions which clearly would not have been enacted into law except upon the assumption that the entire act was valid. The true test of separability is the effectiveness of an act to carry out, without its invalid portions, the original legislative intent in enacting it; and a saving clause will not be given effect where such invalid provisions affect the dominant aim of the whole statute. 11 *Am. Jur., ibid.,* pp. 848, 849; *Carter v. Carter Coal Co.,* 298 U. S. 238, 321, 313; *Williams v. Standard Oil Co.,* 278 U. S. 235, 241-244. 1 Cooley's *Constitutional Limitations,* 368. Cf. *State v. Levi-*

*tan,* 210 N. W. 111 (Wisc.); *Mazurek v. Farmers' Mut. Fire Ins. Co.,* 181 A. 570, 572, 573 (Pa.).

In *Curtis v. Mactier,* 115 Md. 386, 399, 80 A. 1066, this Court stated: "* * * it would be impossible to believe * * * that if the act had been presented to the legislature with the features eliminated which we have held invalid it would have been passed by the legislature * * * and we are of the opinion therefore that the whole act must fall." We think this language is particularly applicable to the case at bar. It is inconceivable that the Mayor and City Council, desiring to collect a budgetary estimate of $2,653,000 for the fiscal year 1958, would have imposed the taxes in question on these appellees alone—the collections for the first quarter, when projected over the balance of the year 1958, indicate that only 57% of the estimated revenue will be produced, with these appellees paying not over 7% of the 57% or about 4% of the budgetary estimate—if they had known the imposition with reference to the newspapers and the stations was invalid. We are therefore of the opinion and hold that the whole of both ordinances must fall.

Having arrived at the above conclusion, it becomes unnecessary for us to consider the other questions raised by the appellees.

*Order affirmed, with costs.*