REQUESTED BY: Senator Ray Janssen Nebraska State Legislature
You have requested our opinion concerning the constitutionality of an amendment to LB 759, AM 1376. The amendment extends Nebraska's sales tax to "[t]he gross income received for casino advertising" when "the seller of the advertising is located" in Nebraska and the advertising is "broadcast, circulated, or displayed" in Nebraska. "Casino" is defined as "any establishment conducting games of chance which are illegal in the State of Nebraska." "Casino advertising" is defined as "purchasing air time on television or radio, purchasing advertising space in newspapers, magazines, or billboards, purchasing or circulating pamphlets or fliers, purchasing or displaying store signs or window displays, or purchasing any product or media time or space to sell or promote the activities of a casino."
"Casino advertising does not include consulting, designing artwork or advertising campaigns, or performing any other creative processes that may result in the purchase of casino advertising." Your question is whether the imposition of sales tax on casino advertising under AM 1376 violates the guarantee of freedom of speech in the First Amendment to the United States Constitution.
For the reasons set forth below, we conclude that the proposed tax on casino advertising likely inhibits free speech rights in violation of the First Amendment. First, the proposed tax on casino advertising does not appear to be the type of "generally applicable" tax which impacts speech that has been approved by the United States Supreme Court. While it is part of the general sales tax, which includes taxation of a variety of tangible personal property and services, it applies only to casino advertising. By singling out a specific form of advertising for taxation, while exempting other advertising and services, the tax likely cannot be viewed as one of "general application." It also appears to target a relatively small group of speakers. Second, because of the limited and special nature of the tax, it probably cannot withstand scrutiny under the four-part test for assessing the constitutionality of laws regulating commercial speech set forth in Central Hudson Gas 
Elec. Corp. v. Public Serv. Comm'n, 447 U.S. 557 (1980). This four-part analysis requires determining: (1) Whether the commercial speech concerns lawful activity and is not misleading; (2) Whether the law involves a substantial governmental interest; (3) Whether the law directly advances the governmental interest asserted; and (4) Whether the law is not more extensive than is necessary to serve the governmental interest. As to part 1, the casino advertising would concern lawful activity relating to casinos located in states where such activity is legal, and, presumably, the advertising would not be misleading. With respect to part 2, the tax would raise revenue, which can be considered a substantial government interest. If raising revenue is deemed a substantial interest, then the requirement of part 3 that the tax directly advance that government interest is also met. Part 4, however, likely is not satisfied. Because the tax is not general, but narrowly targets a specific message and limited group of speakers, it is more extensive than necessary to achieve the governmental interest, as more narrowly tailored alternatives which avoid the selective taxation proposed could be enacted to further the state's need to raise revenue.
 I. ANALYSIS A. The Protection of Commercial Speech Under the First Amendment.
The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech, or of the press. . . ." U.S. Const., amend. 1.[1] At one time, the United States Supreme Court did not view commercial speech as worthy of First Amendment protection. Valentine v. Chrestensen, 316 U.S. 53, 54 (1942) ("[T]he Constitution imposes no . . . restraint on government as respects purely commercial advertising."). The Court has since altered this view, and, in Virginia Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc., 425 U.S. 748 (1976), explicitly held that commercial speech is protected by theFirst Amendment. Explaining its rationale for extending First Amendment protection to commercial speech, the Court in Virginia Bd. of Pharmacy stated:
 Generally, society . . . may have a strong interest in the free flow of commercial information. Even an individual advertisement, though entirely `commercial', may be of general public interest.
* * *
 Advertising, however tasteless and excessive it sometimes may seem, is nonetheless the dissemination of information as to who is producing and selling what product, for what reason, and at what price. So long as we preserve the predominantly free enterprise economy, the allocation of our resources in large measure will be made through numerous private economic decisions. It is a matter of public interest that those decisions, in the aggregate, be intelligent and well informed. To this end, the free flow of commercial information is indispensable.
425 U.S. at 764-65. Expanding on this theme in its later decision in Edenfield v. Fane, 507 U.S. 761, 767 (1993), the Court stated:
The commercial marketplace, like other spheres of our social and cultural life, provides a forum where ideas and information flourish. Some of the ideas and information are vital, some of slight worth. But the general rule is that the speaker and the audience, not the government, assess the value of the information presented. Thus, even a communication that does no more than propose a commercial transaction is entitled to the coverage of the First Amendment.
Since advertising is commercial speech protected by the First
Amendment, the proposed tax on casino advertising raises a question as to whether the tax impermissibly restricts advertisers' First Amendment right to free speech. Resolution of this issue entails considering the Court's decisions involving the validity of taxes challenged as violative of the First Amendment, as well as the Court's First Amendment analysis of the validity of regulations or restrictions affecting commercial speech.
 B. Taxation and the First Amendment.
On several occasions, the Court has addressed claims that taxes affecting the press violated the First Amendment. In Grossjean v. American Press Co., 297 U.S. 233 (1936), the Court struck down a state tax on the gross receipts of advertising imposed only on newspapers with a circulation of more than 20,000 copies per week. While noting that its decision invalidating the tax should not be read "to suggest that owners of newspapers are immune from any of the ordinary forms of taxation for support of the government . . .," the Court held the tax was "not an ordinary form of tax, but one single in kind * * * with the plain purpose of penalizing the publishers and curtailing the circulation of a selected group of newspapers." Id. at 250-51.
In Minneapolis Star and Tribune Co. v. Minnesota Comm'r of Revenue,460 U.S. 575 (1983), the Court held a use tax imposed on the cost of paper and ink products exceeding $100,000 a year consumed in the production of periodic publications violated the First Amendment guarantee of freedom of the press. The Court noted that "[b]y creating this special use tax, . . ., Minnesota ha[d] singled out the press for special treatment." Id. at 582. In striking down this special tax, the Court found the danger posed by subjecting the press to special taxation, rather than taxes of "general applicability," was crucial:
 A power to tax differentially, as opposed to a power to tax generally, gives a government a powerful weapon against the taxpayer selected. When the State imposes a generally applicable tax, there is little cause for concern. We need not fear that a government will destroy a selected group of taxpayers by burdensome taxation if it must impose the same burden on the rest of its constituency. . . . When the State singles out the press, though, the political constraints that prevent a legislature from passing crippling taxes of general applicability are weakened, and the threat of burdensome taxes becomes acute. That threat can operate as effectively as a censor to check critical comment by the press, undercutting the basic assumption of our political system that the press will often serve as an important restraint on government.
Id. at 585.
Minnesota's asserted interest justifying the tax was "the raising of revenue." Id. at 586. While recognizing "that interest is critical to any government . . .," the Court held it could not "justify the special treatment of the press, for an alternative means of achieving the same interest without raising concerns under the First Amendment [was] clearly available: the State could raise the revenue by taxing businesses generally." Id. The Minnesota tax was found unconstitutional not only because "it single[d] out the press," but also because "it target[ed] a small group of newspapers. . . ." Id. at 591. By exempting the first $100,000 in paper and ink costs from taxation, the tax targeted only a few large publishers. Id. at 592. Singling out only a select group of publishers for special taxation created a "potential for abuse" which "resemble[d] more of a penalty for a few of the largest newspapers. . . ." Id. Even absent any indication of an "[i]llicit legislative intent" to target the press or selected members of the press, the Court found the Minnesota tax violated the First Amendment. Id.
In Arkansas Writers' Project, Inc. v. Ragland,481 U.S. 221 (1987), on remand 293 Ark. 395, 738 S.W.2d 402 (1987), the Court invalidated a state sales tax scheme that taxed general interest magazines, but exempted newspapers and religious, professional, trade, and sports journals, as violating the First Amendment guarantee of freedom of the press. Arkansas asserted the differential taxation was permissible because "the Arkansas sales tax [was] a generally applicable economic regulation." Id. at 228-29. The Arkansas tax was invalidated, however, because it singled out a small group of magazines for taxation, while exempting most other magazines, and did so based on content. Id. at 229-30. While recognizing the state's interest in raising revenue was "an important one," the Court found "it [did] not explain selective imposition of the sales tax on some magazines and not others, based solely on their content." Id. at 231.
A few years after its decision in Arkansas Writers' Project, the Court upheld the constitutionality of Arkansas' sales tax on cable television services, even though newspapers and other print media were exempt, against a First Amendment challenge. Leathers v. Medlock,499 U.S. 439 (1991). In Leathers, the Court explained the principles set forth in Grosjean, Minneapolis Star, and Arkansas Writers' Project as follows:
 These cases demonstrate that differential taxation of First Amendment speakers is constitutionally suspect when it threatens to suppress the expression of particular ideas or viewpoints. Absent a compelling justification, the government may not exercise its taxing power to single out the press. . . . The press plays a unique role as a check on government abuse, and a tax limited to the press raises concerns about censorship of critical information and opinion. A tax is also suspect if it targets a small group of speakers. . . . Again, the fear is censorship of particular ideas or viewpoints. Finally, for reasons that are obvious, a tax will trigger heightened scrutiny under the First Amendment if it discriminates on the basis of the content of taxpayer speech.
499 U.S. at 447 (citations omitted).
The Court in Leathers found the Arkansas sales tax on cable television "present[ed] none of these types of discrimination." Id. "The Arkansas sales tax [was] a tax of general applicability . . ." which "applie[d] to receipts from the sale of all tangible personal property and a broad range of services, unless within a group of specific exemptions." Id. The tax did "not single out the press . . .," and did not "target a small number of speakers . . .," as it applied to approximately 100 cable systems in the State of Arkansas. Id. at 447-48. Finally, the tax "[was] not content based. . . ." Id. at 449.
Since the Arkansas tax "present[ed] none the First Amendment difficulties that . . . led the [Court] to strike down differential taxation in the past," the Arkansas tax would be invalidated "only if the Arkansas tax scheme present[ed] `an additional basis' for concluding the tax violated the First Amendment. Id. at 449 (quoting Arkansas Writers' Project, 481 U.S. at 233). The cable operators argued the discrimination between different media (i.e., taxing cable television but exempting print media) constituted an "additional basis" requiring invalidation of the Arkansas sales tax on cable television services. Rejecting this claim, the Court noted its decisions in Regan v. Taxation with Representation of Wash., 461 U.S. 540 (1983) and Cammarano v. United States, 358 U.S. 498 (1959), established "that a legislature is not required to subsidize First Amendment rights through a tax exemption or a tax deduction." 499 U.S. at 450-51. Citing to Regan, as well as Mabee v. White Plains Publishing Co., 327 U.S. 178 (1946) and Oklahoma Press Publishing Co. v. Walling, 327 U.S. 186 (1946), the Court stated:
 Taken together, Regan, Mabee, and Oklahoma Press establish that differential taxation of speakers, even members of the press, does not implicate the First Amendment unless the tax is directed at, or presented the danger of suppressing, particular ideas. That was the case in Grosjean, Minneapolis Star, and Arkansas Writers', but it is not the case here. The Arkansas Legislature simply chose to exclude or exempt certain media from a generally applicable tax. Nothing about that choice has ever suggested an interest in censoring the expressive activities of cable television. Nor does anything in this record indicate that Arkansas' broad-based, content-neutral sales tax is likely to stifle the free exchange of ideas. We conclude that the State's extension of its generally applicable sales tax to cable television services alone, or to cable and satellite systems, while exempting the print media, does not violate the First Amendment.
Id. at 453.
The United States Supreme Court's decisions concerningFirst Amendment taxation have involved only taxes on noncommercial speech. While the Court has not considered the validity of taxes imposed on commercial speech, such as advertising, at least two state courts have addressed First Amendment challenges to advertising taxes. In City of Baltimore v. A. S. Abell Co., 218 Md. 273, 145 A.2d 111 (1958), the Court of Appeals of Maryland held that municipal ordinances taxing advertising violated the First Amendment. One ordinance imposed on purchasers a tax of four percent of the gross sales price of the space for printed advertising or the time for any broadcast advertising in Baltimore. Id. at 277-78, 145 A.2d at 112-13. A second ordinance levied on the sellers of such advertising a tax of two percent on gross receipts. Id. Although the tax ordinances were repealed after only one year, newspaper publishers, radio and television broadcasters, billboard operators, and advertising purchasers sued to recover taxes paid under the ordinances, asserting the taxes violated the First Amendment. Id. at 113,145 A.2d at 278. Finding the effect of the two taxes was essentially the same for purposes of considering the First Amendment issue, the court applied a single analysis in assessing the claim that the taxes abridged the freedoms of speech and of the press guaranteed by the Constitution. Id. at 283, 145 A.2d at 116.
The City of Baltimore defended the validity of the taxes by asserting that, while not reaching all advertising, the taxes were "broad enough in their nature and character so as to escape the designation of being `single in kind' and therefore [did] not violate the immunities of freedom of speech or of the press." Id. at 283, 145 A.2d at 116. Discussing this contention, the court noted "this argument is predicated upon, and assumes, the fact that the taxes involved herein are ordinary or general in nature and operation, as distinguished from special or `single in kind' taxes." Id. at 287, 145 A.2d at 118 (emphasis in original). This was significant because, the court noted, "when [a] tax is imposed upon a business that enjoys one of the constitutional immunities of theFirst Amendment, it must be general in its nature and character and affect this business only incidentally as it affects other businesses in their combined duty to support the government." Id. The court found the taxes were not general, but "singled out" entities entitled to First Amendment protection "to pay a special tax that [was] not required of business in general or some broad portion thereof." Id. at 288, 145 A.2d at 118-19. Because the taxes were "so single in their nature and the range of their impact [was] so narrow — 90% to 95% thereof falling upon the newspapers and the [radio and television] stations- their effect ma[de] them constitute a restraint on the freedoms of speech and of the press guaranteed" by the Constitution. Id. at 288-89, 145 A.2d at 119.
In an advisory opinion issued at the request of the Governor, the Supreme Court of Florida concluded that legislation extending Florida's sales tax to previously untaxed services, including advertising, did not facially violate the freedom of speech and press guarantees in theFirst Amendment. In re Advisory Opinion to the Governor, 509 So.2d 292
(Sup.Ct. Fla. 1987). Citing the U.S.Supreme Court's decision in Arkansas Writers' Project, Minneapolis Star, and Grosjean, the court stated "[i]t was beyond question that advertisers and the press are not immune from ordinary, nondiscriminatory taxes of general application."509 So.2d at 306. The court found the "tax on the sale of services [was] one of general application and [did] not single out advertisers or the press for special taxation." Id. In finding the advertising tax did not violate the First Amendment, the court noted did the tax did "not impact only a select few advertisers or publications . . .," and did not "unconstitutionally discriminate between publications based on content." Id. at 308.
City of Baltimore v. A. S. Abell Co. and In re Advisory Opinion to the Governor indicate that the question of whether a tax impermissibly impacts commercial speech such as advertising may, to some degree, appropriately be analyzed by resort to the standards used by the Supreme Court in cases such as Grosjean, Minneapolis Star, Arkansas Writers', and Leathers, to evaluate the constitutionality of taxes on noncommercial speech. Basically, the relevant considerations are whether the tax is "generally applicable," and does not "single out" particular speakers or "target only a small number" of speakers. Leathers, 499 U.S. at 447-48.
Judged by these standards, the casino advertising tax is constitutionally suspect. The tax is part of Nebraska's sales and use tax scheme, which imposes a tax on the sale or use of tangible personal property and certain services, subject to specific exemptions. In that respect, it could be argued that the tax, although limited to "casino" advertising, is "generally applicable." While this argument has facial appeal, it fails to properly recognize the extremely narrow and limited application of the tax. The tax is not imposed on advertising generally, but applies only to the extraordinarily limited subject of "casino advertising." By "singling out" commercial speech relating only to casino advertising for taxation, while all other advertising remains exempt from taxation, the tax does not appear to truly be one of "general application." Also, while the bill does apply to advertising by all media, limiting the tax to casino advertising appears to target the tax towards a small number of speakers. Since, as noted in the legislation, casino gambling in Nebraska is illegal, the casino advertising to be taxed likely relates to advertising by casinos in surrounding states which permit casino gambling. While we obviously have no empirical data concerning the scope and nature of advertising activity in Nebraska by out-of-state casinos, it is logical to conclude that the bulk of such advertising involves marketing by the three casinos located in Council Bluffs, Iowa, and directed towards the large metropolitan population in Omaha, Nebraska, as well as eastern Nebraska as a whole. If the primary impact of the tax would, as we surmise, fall almost exclusively on these three casinos in Iowa, it may well violate the First Amendment because it is directed at too small a group of speakers. A tax which singles out a specific advertiser or advertisers for disproportionate taxation may be found to impermissibly inhibit First Amendment rights. The casino advertising tax appears to be just such a tax.
 C. Commercial Speech and the Central Hudson Test.
In addition to the line of authority in which the United States Supreme Court has considered the validity of taxes imposed on activities protected by the First Amendment, the Court has, in a long series of cases, addressed First Amendment challenges to restrictions on commercial speech in a variety of areas. As noted in part I.A., infra, the Court first explicitly held that commercial speech was protected by theFirst Amendment in Virginia Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc., 425 U.S. 748 (1976). In its later decision in Central Hudson Gas Elec. Corp. v. Public Serv. Comm'n, 447 U.S. 557 (1980), the Court clarified the standards to be employed in assessing the constitutionality of restrictions or regulations of commercial speech.
In Central Hudson, the Court invalidated regulations prohibiting advertising and other promotional activities by electric utilities. Confirming prior precedents recognizing that "[t]he Constitution . . . accords a lesser degree of protection to commercial speech than to other constitutionally guaranteed expression . . .," the Court adopted the following four-part analysis for evaluating the constitutionality of commercial speech regulations:
 At the outset, we must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than is necessary to serve that interest.
447 U.S. at 566.
The Court has applied the Central Hudson analysis in a variety of contexts. In Posadas de Puerto Rico Associates v. Tourism Co. of Puerto Rico, 478 U.S. 328 (1986), five members of the Court joined in an opinion which upheld the constitutionality of a Puerto Rican statute that restricted advertising of casino gambling aimed at residents of Puerto Rico, while allowing local advertising targeted at tourists. Applying Central Hudson, the majority found this was commercial speech which involved a lawful activity (casino gambling was legal in Puerto Rico) and was not misleading. Id. at 340-41. The government interest asserted in support of the restriction, reducing the demand for casino gambling by residents of Puerto Rico, was found to be "substantial," in view of the potential harm to the "health, safety, and welfare" of Puerto Rico's citizens posed by casino gambling. Id. at 341. The majority found the challenged restrictions "directly advance[d]" the government's interest, finding the "legislature's belief" that the restrictions would reduce casino gambling by residents was "a reasonable one." Id. at 342. The Court reached this conclusion in spite of the fact that the restrictions applied only to casino gambling, and did not apply to advertisements concerning horse racing, cockfighting, and the lottery. Id. Finally, the majority concluded the restrictions were no more extensive than necessary to serve the government's interest, as the restrictions were limited to advertising to Puerto Rico residents. Id. at 343-44. The majority distinguished the advertising restrictions on casino gambling at issue in Posadas from advertising bans struck down in prior cases (Carey v. Population Services International, 431 U.S. 678 (1977) (ban on advertising or displaying contraceptives) and Bigelow v. Virginia,421 U.S. 809 (1975) (ban on advertisements encouraging abortion)) by noting the advertising in those cases related to conduct that was "constitutionally protected and could not have been prohibited by the State." Id. at 345. "Here, on the other hand, the Puerto Rico Legislature surely could have prohibited casino gambling by the residents of Puerto Rico altogether. In our view, the greater power to completely ban casino gambling necessarily includes the lesser power to ban advertising of casino gambling. . . ." Id. at 345-46.
In United States v. Edge Broadcasting Co., 509 U.S. 418 (1993), the Court upheld the constitutionality of federal statutes (18 U.S.C. § 1304 and 1307) that prohibited the broadcasting of lottery advertising by a broadcaster licensed in a state that did not allow lotteries (North Carolina), while allowing such broadcasting by a broadcaster licensed in Virginia, a state that sponsored a lottery, even though the Virginia broadcaster's signal extended into North Carolina. Applying Central Hudson, the Court recognized that the advertising involved a legal activity, since it concerned a legal lottery in Virginia, and assumed the advertising would not be misleading. Id. at 426. The statutes were found to "directly advance" the federal governmental's substantial interest in supporting the policies of nonlottery states while at the same time not interfering with the policies of lottery states. Id. at 428. The majority also concluded that the statutory restriction was "no more extensive than necessary" because, as was the case in Posadas, the "fit" between the restriction and the governmental interest, while "not necessarily perfect," was "reasonable." Id. at 429.
In subsequent decisions, the Court has retreated from the deferential standard of review taken in Posadas and Edge relating to the requirements of Central Hudson that restrictions on commercial speech must "directly advance" the government's interest and must not be more extensive than necessary to serve that interest. In Rubin v. Coors Brewing Co., 514 U.S. 476 (1995), the Court, without dissent, held unconstitutional a federal statute prohibiting beer labels from displaying alcohol content. There was no question that the statute related to commercial speech about a lawful activity which was not misleading. Id. at 483. In support of the ban, the government argued it directly advanced Congress' substantial interest in curbing "strength wars" by beer brewers competing for customers based on alcohol content. Id. The Court determined the ban did not "directly and materially advance its asserted interest because of the overall irrationality of the regulatory scheme." Id. at 488. The statute allowed disclosure of alcohol content on labels of wine and hard liquor, and permitted identification on labels of higher alcohol content by inclusion of the term "malt liquor." Id. at 488-89. The exceptions and internal contradictions in the statute thus did not materially advance the asserted goal. Further, the Court found the advertising ban was "not sufficiently tailored to its goal." Id. at 490. Other alternatives, including directly limiting alcohol content of beer, were available to achieve the government's interest. Id. at 490-91. Significantly, the Court unanimously rejected the government's contention that, under Posadas and Edge, "legislatures' have broader latitude to regulate speech that promotes socially harmful activities, such as alcohol consumption, than they have to regulate other types of speech." Id. at 482n.2. The Court noted that neither Posadas nor Edge compelled crafting such an exception to Central Hudson, and specifically retreated from the statement in Posadas that the "greater power" to prohibit casino gambling included the "lesser power" to ban promotional advertising of casino gambling, noting this passage was dictum reached after the Court had already held the statute valid under Central Hudson. Id.
In 44 Liquormart, Inc. v. Rhode Island, 517 U.S. 484 (1996), the Court considered a First Amendment challenge to a state law banning advertising of retail prices of alcohol except at the point of sale. Justice Stevens, writing for the plurality, noted that because the "price advertising ban constitute[d] a blanket prohibition against lawful, nonmisleading speech about a lawful product . . .," the Court "review[ed] the price advertising ban with `special care,' . . .," stating that "speech prohibitions of this type rarely survive constitutional scrutiny." Id. at 504 (citation omitted). The blanket prohibition on price advertising failed to survive scrutiny under Central Hudson, as there was no evidence it would "significantly advance the State's interest of temperance." Id. at 505. The ban also failed to "satisfy the requirement that the restriction on speech be no more extensive than necessary . . .," as "obvious" other forms of regulation which did not restrict speech were available to achieve the state's temperance goals, including higher prices through direct regulation or increased taxation. Id. at 507. The plurality also rejected the "greater-includes-the-lesser" reasoning in Posadas, as well as the contention that the Court should recognize a "vice" exception in commercial speech matters based on language in Edge characterizing gambling as a "vice," an exception which was "effectively rejected" in Rubin. Id. at 508-14.
The Court again applied Central Hudson in the context of considering a restriction on gambling advertising in Greater New Orleans Broadcasting Ass'n, Inc. v. United States, 527 U.S. 173 (1999). Greater New Orleans involved a First Amendment challenge to a federal statute (18 U.S.C. § 1304) asserting the statute could not be applied to prohibit advertisements regarding casino gambling broadcast in a state where the gambling was legal. Id. at 176. There was no question that the speech involved lawful activity, and was not misleading. Id. at 184. The asserted governmental interest behind the restriction was "reducing the social costs associated with `casino gambling'," as well as "assisting States that `restrict gambling' or `prohibit casino gambling' within their own borders." Id. at 185. The Court "accept[ed] the characterization of these two interests as `substantial,'" but noted "that conclusion [was] by no means self-evident." Id. at 186. The restriction did not, however, "directly and materially advance the asserted governmental interest[s] . . .," and was "more extensive than necessary" to achieve such interests. Id. at 188. The Court found the statute was "so pierced by exemptions and inconsistencies" that it could not survive First Amendment scrutiny. Id. at 190.
In Lorillard Tobacco Co. v. Reilly, 533 U.S. 525 (2001), the Court considered, in part, First Amendment challenges to Massachusetts regulations restricting the promotion of tobacco products. Expanding on the scope of the third and fourth parts of the Central Hudson test, the Court noted "[t]he third step of Central Hudson concerns the relationship between the harm that underlies the State's interest and the means identified by the State to advance that interest." Id. at 555. "It requires that `the speech restriction directly and materially advancethe asserted government interest. . . .'" Id. (quoting Greater New Orleans, 527 U.S. at 188). The fourth step of Central Hudson "`complements'" the third step, "`asking whether the speech restriction is not more extensive than necessary to serve the interests that support it.'" Id. at 556 (quoting Greater New Orleans, 527 U.S. at 527). "`[T]he least restrictive means'" is not the standard; instead, the case law requires a reasonable "`fit between the legislature's ends and the means chosen to accomplish those ends, . . . a means narrowly tailored to achieve the desired objective.'" Id. at 556 (quoting Florida Bar v. Went for It, Inc., 515 U.S. 618, 632 (1995) (quoting Board of Trustees v. State Univ. of N.Y. v. Fox, 492 U.S. 469, 480 (1989))).
Applying these aspects of Central Hudson, the Lorillard Court struck down regulations prohibiting outdoor advertising for smokeless tobacco and cigars within a certain distance of schools or playgrounds, finding the regulations were "more extensive than necessary to advance the State's substantial interest in preventing underage tobacco use." Id. at 565. In addition, regulations which restricted indoor, point-of-sale advertising for cigars and smokeless tobacco by placing a height requirement on such advertising in retail establishments a certain distance from schools or playgrounds were held invalid because they did not satisfy the third and fourth prongs of Central Hudson. Id. at 566-67. The height requirement did not directly advance the state's goals of preventing minors from using tobacco products or curbing demand by limiting youth exposure to advertising, nor did it "constitute a reasonable fit" to achieve those goals. Id.
Evaluating the proposed casino advertising tax under the four part test set forth in Central Hudson and its progeny, there is no question that part 1 is satisfied. While the term "casino," as defined in the amendment, refers to an establishment which conducts games of chance which would be illegal if conducted in Nebraska, the advertising to be taxed obviously pertains to advertising in Nebraska by casinos located in states in which such gambling activity is lawful. Presumably, this advertising would be truthful and not misleading. As to part 2 of Central Hudson, the tax would raise revenue, which can be considered a "substantial" governmental interest.[2] Accepting raising revenue as a substantial governmental interest, then the requirement of part 3 that the commercial speech restriction "directly advance" the government's interest is necessarily met. Part 4 of the Central Hudson test, however, likely is not satisfied. In considering application of this aspect of Central Hudson, the Court's evaluation of the validity of taxes on noncommercial speech is instructive. Because the casino advertising tax is not truly general, but narrowly targets a specific category of advertising and a limited group of speakers, it is more extensive than necessary to achieve the governmental interest, as more narrowly tailored alternatives which avoid the selective taxation proposed could be enacted to further the state's need to raise revenue. For example, the tax could be imposed on all advertising, thus avoiding the disproportionate impact on specific commercial speech implicated by the narrow "casino advertising" tax. As a result, we do not believe that the casino advertising tax proposed under AM 1376 would be likely to survive scrutiny if challenged as violating the First Amendment.[3]
 II. CONCLUSION
Based on the foregoing, we conclude that the casino advertising tax proposed under AM 1376 to LB 759 is constitutionally suspect. Extending the sales tax to only casino advertising, as opposed to advertising generally, singles out a distinct form of advertising for taxation, and appears to target a few selected speakers. As such, the tax does not seem to be the type of "generally applicable" tax impacting speech which the United States Supreme Court has held is permissible under the First
Amendment. For the same reason, the casino advertising tax probably does not satisfy the requirement of the last portion of the Court's Central Hudson test for assessing the constitutionality of restrictions on commercial speech. Because the casino advertising tax is not truly general, but narrowly targets a specific category of advertising and a limited group of speakers, it is more extensive than necessary to achieve the governmental interest of raising revenue, as more narrowly tailored alternatives which avoid the selective taxation proposed could be enacted to further the state's revenue raising needs.
Very truly yours,
 JON BRUNING Attorney General
 L. Jay Bartel Assistant Attorney General
APPROVED:
________________________________ Attorney General
pc: Patrick O'Donnell, Clerk of the Legislature
[1] The First Amendment, including the rights to freedom of speech and freedom of the press, are applicable to the states by virtue of the due process clause of the Fourteenth Amendment. See Gitlow v. New York, 268 U.S. 652, 666 (1925).
[2] The casino advertising tax has reportedly been justified as a means to raise revenue to fund programs which deal with the social costs imposed on Nebraska resulting from the harm its citizens suffer because of legalized casino gambling in other states. Nothing in the proposed legislation indicates any revenue raised by the casino advertising tax is dedicated for such a purpose, and, as such, it must be evaluated as a general revenue raising measure.
[3] Because the tax at issue is directed only to "casino advertising," it has been suggested that the tax is a "content-based" restriction on free speech subject to strict or heightened scrutiny. The Court has declined to adopt a strict scrutiny approach to content specific commercial speech regulations, and has consistently applied "the somewhat less rigorous standards of Central Hudson." Anderson v. Treadwell,294 F.3d 453, 460 (2d Cir. 2002) (citing Thompson v. Western States Medical Center, 535 U.S. 357 (2002)). Since we believe the proposed tax fails to satisfy the traditional Central Hudson standard, it is not necessary to consider if a heightened "content-based" scrutiny would be appropriate.